**THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

|  |  |
|---|---|
| MFB Fertility, Inc., | |
| Plaintiff, | Case No. 1:23-cv-03854 |
| v. | Dist. Judge Harry D. Leinenweber |
| Action Care Mobile Veterinary Clinic, LLC, | |
| Defendant. | Mag. Judge Gabriel A. Fuentes |

## CITED UNREPORTED OPINIONS

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

THE SUNNY FACTORY LLC D/B/A
THE SUNNY FACTORY,

|||
|---|---|
| Plaintiff, | |
| v. | Case No. 1:21-cv-03648 |
| HAOYI CHEN, ESQ., ARCH & LAKE, LLP, FUXI (HANGZHOU) INTELLECTUAL PROPERTY MANAGEMENT CO., LTD. And JOHN DOES 1-5. | |
| Defendants. | |

## FINAL JUDGMENT ORDER

This action, having been commenced by Plaintiff The Sunny Factory LLC D/B/A/ The Sunny Factory (hereinafter: "Plaintiff") against Defendant, Fuxi Intellectual Property Management Co., Ltd (hereinafter: "Defaulting Defendant"), and Plaintiff having moved for entry of Default and Default Judgment against Defaulting Defendant;

Plaintiff having properly completed service of process on Defaulting Defendant, providing notice via e-mail to the email address provided for Defaulting Defendant by Amazon.com, being notice reasonably calculated under all circumstances to apprise Defaulting Defendant of the pendency of the action and affording them the opportunity to answer and present their objections; and

Defaulting Defendant having failed to answer the Complaint or otherwise plead, and the time for answering the Complaint having expired;

THIS COURT HEREBY FINDS that it has personal jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., 28 U.S.C. §

1338(a)-(b) and 28 U.S.C. § 1331. Specifically, this Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts. Defendant directly targets business activities toward consumers in the United States, including Illinois residents by: setting up and operating e-commerce stores that target United States consumers including those in Illinois; offering and shipping goods to the United States, including Illinois; accepting payment in U.S. dollars and selling products to residents of Illinois; committing tortious acts in Illinois; engaging in interstate commerce; and/or wrongfully causing Plaintiff substantial harm in Illinois, and lastly, through the practice of law in an office situated in Illinois.

THIS COURT FUTHER FINDS that Defaulting Defendant is liable to Plaintiff for defamation, defamation per se, tortious interference with business and contractual relations, and violations of the Digital Millennium Copyright Act, DMCA-Copyright Act 17 U.S.C. §512(f)(1).

IT IS HEREBY ORDERED that Plaintiff's Motion for Entry of Default and Default Judgment is GRANTED, that Defaulting Defendant is deemed in default, and that this Final Judgment is entered against Defaulting Defendant.

IT IS FURTHER ORDERD that:

1. Defaulting Defendant be permanently enjoined from knowingly making false, frivolous, and defamatory claims in, on or to the online marketplace Amazon.com ("Amazon") by falsely claiming that Plaintiff markets or sells candles on Amazon.com that infringe on Defaulting Defendant's intellectual property rights in violation of the processes laid out by the Digital Millennium Copyright Act.

This is a Final Judgment.

DATED: January 16, 2022

_____
Honorable Virginia M. Kendall
United States District Court Judge

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE SUNNY FACTORY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 21 C 3648 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| HAOYI CHEN, ESQ., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff The Sunny Factory, LLC sells candles on Amazon that have a pattern of light green sage leaves on the outside of the candles. Sunny Factory brought claims against Defendants Haoyi Chen, Esq. and Arch & Lake, LLP ("Defendants"), who are lawyers, alleging that the attorneys' actions are causing harm to Sunny's business. (Dkt. 1). Defendants represent Fuxi (Hangzhou) Intellectual Property Management Co. Ltd., a foreign corporation and the owner of a copyrighted image of painted green sage leaves. When Defendants reported to Amazon that their client's copyright was being infringed, Amazon stopped the sale of Sunny's products. Plaintiff then sued under the federal Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, and also brought state law claims for defamation and tortious interference with a contract. (*Id.*). For the reasons discussed below, Defendants' Motion to Dismiss [5] is granted.

## BACKGROUND

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). Unless otherwise noted, the following factual allegations are taken from Plaintiff's

Complaint [1] and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

The Sunny Factory is a domestic corporation marketing and selling scented candles on Amazon.com, Inc. ("Amazon") and organized under the laws of Florida. (Dkt. 1 ¶ 22). Fuxi (Hangzhou) Intellectual Property Management Co. Ltd. ("Fuxi") is a foreign corporation and the copyright owner of "Green Sage," an image of painted sage leaves, U.S. Copyright Reg. No. VA0002247096. (*Id*. at ¶¶ 2, 24). Fuxi is a client of Haoyi Chen, Esq., an attorney employed at Arch & Lake, LLP in Chicago, Illinois. (*Id*. at ¶ 23). Plaintiff also brings this claim against John Does 1 – 5, unknown to Plaintiff but believed to be involved in the relevant acts. (*Id*. at ¶ 25). Throughout the Complaint, Plaintiff refers to the defendants in unison. (*Id*.).

According to The Sunny Factory, Defendants filed knowingly false and frivolous claims with Amazon alleging its candle products and packaging contain images violating Fuxi's "Green Sage" copyright. (*Id*. at ¶ 2). The Sunny Factory instead claims the packaging was pulled from a third party and is not original to Fuxi. (*Id*. at ¶ 3). Fuxi's copyrighted image "Green Sage" (Exhibit A) and The Sunny Factory's candle product (Exhibit B) are included below for reference, and both include images of painted light green sage leaves. (Dkt. 1 ¶ 12).

        

Exhibit A                              Exhibit B

Defendants filed notices with Amazon, pursuant to the DMCA, claiming The Sunny Factory used copyrighted images. (*Id.* at ¶ 4). In response, Plaintiff filed counter-notices, and Amazon de-listed the products. (*Id.* ¶¶ 4 – 7). Defendants re-filed the identical complaint with Amazon, forcing Amazon to maintain the removal of The Sunny Factory's products causing Plaintiff economic harm. (*Id.* at ¶¶ 4 – 7). Specifically, Haoyi Chen submitted complaints to Amazon regarding three of Plaintiff's products on November 7, 2020 and twice on January 31, 2021. (*Id.* at ¶¶ 35 – 36). Amazon has an automated process for addressing complaints related to infringement of copyrighted material and suspends the subjects of such complaints. (*Id.* at ¶¶ 29 – 30). The Sunny Factory appealed the suspension of its Amazon sales privileges but has been prohibited from selling the relevant products on Amazon since November 2020. (*Id.* at ¶¶ 39 – 43). The resulting economic harm amounts to a loss of $500,000 per month in sales. (*Id.* at ¶¶ 10).

The Sunny Factory owns the packaging design, U.S. Copyright Reg. No. VA 0002236068, accused by Defendants of copyright infringement. (*Id.* at ¶ 11). The Sunny Factory submitted a Notice of Preservation on May 4, 2021 to Amazon raising this issue. (*Id.* at ¶ 37). The Sunny Factory reached out on May 27, 2021, to Defendants requesting a voluntary revocation of the complaint with Amazon to no avail. (*Id.* at ¶ 38). Since around May 2021, Amazon accuses The Sunny Factory of "Suspected Copyright IP Violation" and Plaintiff has no avenue to appeal this description of its account. (*Id.* at ¶ 44).

Plaintiff raises six claims for relief. The first count is a request for declaratory judgment of non-infringement as a matter of law under 28 U.S.C. § 2201. (*Id.* at ¶¶ 47 – 57). As second and third counts, Plaintiff accuses Defendants of defamation and defamation per se. (*Id.* at ¶¶ 58 – 84). The Sunny Factory's fourth claim for relief is based on tortious interference with

3

prospective economic advantage. (*Id*. at ¶¶ 85 – 89). The fifth claim is tortious interference with business and contractual relations. (*Id*. at ¶¶ 90 – 99). Finally, Plaintiff alleges Defendants violated the DMCA by "knowingly materially misrepresenting that Plaintiff's candles comprise infringing material." 17 U.S.C. §512(f)(1); (Dkt. 1 ¶¶ 100 – 03). On January 14, 2022, The Sunny Factory moved for a default judgment as to Fuxi which was granted on February 16, 2022. (Dkt. 18; Dkt. 21).

## **LEGAL STANDARD**

"To survive a motion to dismiss under 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams*, 742 F.3d at 728 (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). "[I]t is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief…by providing allegations that 'raise a right to relief above the speculative level.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at 555) (emphasis in original). The Court construes the complaint "in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in her favor." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 566 U.S. at 678).

## **DISCUSSION**

### A. **Count I: Declaratory Judgment**

In the Motion to Dismiss as well as in Plaintiff's Response, both parties stipulate that no "actual controversy" exists between Plaintiff and the Defendants. (Dkt. 5; Dkt. 12). The Defendants are not the owners of the copyright for "Green Sage" and could not bring a copyright infringement action against the Plaintiff. (*Id*.). The first count is dismissed with prejudice.

### B. **Counts II & III: Defamation Causes of Action**

Plaintiff claims that the statements made by the Attorney Defendants to Amazon constitute defamation because they falsely allege that Plaintiff was infringing the Green Sage copyright. These statements were notices to Amazon by the attorneys that the copyright was being infringed. The only acts giving rise to the claims of defamation in the Complaint are the two submissions to Amazon providing notice of copyright infringement. (Dkt. 1). The Sunny Factory does not allege any other actions that could be considered the basis for the defamation claims in Counts II and III. (*Id*.). The notice statements then triggered the Amazon policy of removing the potentially infringing products.

Statements made in the course of litigation are absolutely privileged from claims of defamation. *Lewis v. School Dist. #70*, 523 F.3d 730, 745 – 46 (7th Cir. 2008). "An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications *preliminary* to a proposed judicial proceeding, or in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." *Id*. (quoting *Atkinson v. Affronti*, 369 Ill. App. 3d 828 (2006) (quoting Restatement (Second) of Torts, § 586 (1977)) (emphasis in original)). This applies regardless of any knowledge by an attorney of the statement's veracity. *Id*. In *Atkinson*, the Court held an attorney's statement

5

to the plaintiff's employer of an intention to hold the employer vicariously responsible was privileged because it was made by an attorney in contemplation of litigation, even though no civil litigation ultimately followed. *Atkinson* 369 Ill. App. 3d.

Since the statements at issue here were made to Amazon during the notice and takedown period, they are absolutely privileged. (Dkt. 1; Dkt. 5). Both parties recognize that the notice and takedown period may result in litigation if either party disagrees with Amazon's. (Dkt. 5; Dkt. 12). Plaintiff provided its understanding of the process in its Response: "The DMCA exists to protect third-party platforms, such as Amazon, from liability by affording copyright owners the ability to notify them of potential infringement, who then notifies the alleged infringer, who has the right to file a counter-notice *that then requires the rights owner to file a lawsuit and have its allegations addressed in a judicial proceeding*." (Dkt. 12) (emphasis added). In its Response, The Sunny Factory admits that the process of filing a notice of copyright infringement anticipates the potential for a judicial proceeding. It is clear these proceedings are communications preliminary to a proposed judicial proceeding. *Lewis* at 745. Any doubt as to whether a statement is relevant to a judicial proceeding "should be resolved in favor of a finding of pertinency." *Malevitis v. Friedman*, 323 Ill. App. 3d 1129, 1131 (2001). Counts II and III are dismissed.

### C. Counts IV & V: Tortious Interference

Counts IV and V allege tortious interference with prospective economic damage and tortious interference with business and contractual relations. (Dkt. 1 ¶¶ 85 – 99). An attorney owes a fiduciary duty to his or her client and as such is privileged to act "to protect a conflicting interest which is considered to be of equal or greater value than that accorded the contractual rights involved." *Schott v. Glover*, 109 Ill. App. 3d 230, 234 – 35 (1982).

A plaintiff can overcome the privilege accorded an attorney acting in the interest of a client and sufficiently "state a cause of action for tortious interference with a contract . . . if the plaintiff can set forth factual allegations from which actual malice may reasonably be said to exist . . . Such allegations, however, would necessarily include a desire to harm, which is independent of and unrelated to the attorney's desire to protect his client." *Schott*, 109 Ill. App. 3d at 235 (citing *Arlington Heights Nat'l Bank v. Arlington Heights Federal Savings & Loan Assoc.*, 37 Ill.2d 546 (1967)). To defeat Defendants' Motion to Dismiss, Plaintiff must sufficiently allege facts amounting to malice that would overcome the conditional privilege. *See Storm & Associates, Ltd. v. Cuculich*, 298 Ill. App. 3d 1040, 1052 – 53 (1998) ("When . . . the existence of a privilege in favor of the defendant is apparent on the face of a claim for tortious interference with prospective economic advantage, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious . . . . The bare conclusions that [Defendants] acted intentionally, maliciously, and without cause or justification are insufficient to negate the protection of the privilege arising by reason of the attorney-client relationship here.").

Plaintiff did not allege actual malice in Counts IV or V. Rather, the only assertion of actual malice is included in the Complaint under Counts II and III. (Dkt. 1 ¶¶ 64, 77). In both cases, The

Sunny Factory provided blanket statements that the Defendants in unison "acted with actual malice or with reckless disregard for the truth of their statements to Amazon." (*Id.* at ¶ 77). At no point did The Sunny Factory allege any specific facts to support this claim. (*Id.*). Making broad assertions that mimic the elements of the claim is not sufficient to meet the requirements for a well-pleaded complaint. *McCauley*, 671 F.3d at 616. Copyright holders have an obligation to police the field where their marks may be used and to give notice to potential infringers in order to preserve their rights. *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 (7th Cir. 1994) ("An owner of a copyright is protected against unauthorized copying.") (citing *Mazer v. Stein*, 347 U.s. 201, 218 (1954). Without facts that take this out of the ordinary behavior of copyright holders, Plaintiff fails to state a claim. Additionally, The Sunny Factory neglected to meaningfully respond to the assertion of privilege in its Response, citing no cases in response to the Defendants' argument that privilege protects them from the allegations in the Complaint. (Dkt. 12). Counts IV and V are dismissed.

### D. Count VI: Violation of DMCA Copyright Act

There is limited case law in the Seventh Circuit interpreting a cause of action based on 17 U.S.C. §512(f). Defendants put forward case law from other jurisdictions to support the premise that Plaintiff insufficiently pled facts to constitute a violation. (Dkt. 5). In order to survive Defendants' Motion to Dismiss, The Sunny Factory must plead facts demonstrating that Defendants "knowingly materially misrepresent[ed] . . . that material or activity is infringing . . . ." 17 U.S.C. §512(f)(1). This provision imposes a high standard for finding a violation of the DMCA by a copyright owner in infringement notifications. The Ninth Circuit held as much in *Rossi v. Motion Picture Ass'n of America Inc.*, stating, "In §512(f), Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the

copyright owner's notification is a knowing misrepresentation.  A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake…Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner."  391 F.3d 1000, 1004 – 05 (9th Cir. 2004).  This Court comes to the same conclusion.  It cannot be that Congress intended broad punitive authority to curtail inaccurate notifications of copyright infringement without proof of knowing and intentional misrepresentation.

The Sunny Factory asserted no specific facts to support the allegation that Defendants made a knowing misrepresentation rather than merely a mistake.  The Sunny Factory claims, "Defendants made the knowing material statements repeatedly to Amazon, and did so with full and actual knowledge that Plaintiff's products do not contain infringing materials.  Defendants made the misrepresentations for the purpose of unlawfully stifling competition by abusing and weaponizing the Amazon IP dispute system."  (Dkt. 1 at ¶ 102).  Again, in a well-pleaded complaint, "conclusory allegations merely reciting the elements of the claim are not entitled to [the] presumption of truth."  *McCauley*, 671 F.3d at 616.

Plaintiff's Response cites to § 512(g)(2)(C) for the premise that Defendants acted improperly when filing repeated claims for copyright infringement.  Plaintiff claims this behavior without filing a claim in court demonstrates Defendants acted in bad faith.  (Dkt. 12).  Plaintiff incorrectly asserts that § 512(g)(2)(C) imposes this requirement on Defendants.  Rather, § 512(g)(2) provides an exception to liability for a service provider's good faith disabling of access to material.  Count VI is dismissed.

**CONCLUSION**

For the reasons set forth above, Defendants' Motions to Dismiss [5] is granted.  Although it does not appear that Plaintiff can amend his complaint to comport with this opinion, the Court provides Plaintiff until 3/23/22 to file any amending pleading or motion if he is able.

Virginia M. Kendall
United States District Judge

Date: March 11, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MILO ENTERPRISES, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 6315 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| BIRD-X, INC. | ) | |
| | ) | |
| Defendant. | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Milo Enterprises, Inc. ("Milo") and Defendant Bird-X, Inc. ("Bird-X") are both corporations that produce bird repellant products, including balloons intended to scare birds away. Milo markets its own bird repellant balloons under the name VisualScare and describes them as "Scary Eye Balloons." Bird-X has trademarked its line of bird repellant balloons under the name "SCARE-EYE."

Unable to resolve their differences, Milo seeks a declaratory judgment that it is not infringing upon Bird-X's trademark, copyright, and trade dress and that Bird-X's "SCARE-EYE" trademark is unenforceable. Milo also filed claims for tortious interference with business relations; unfair competition under the Lanham Act, 15 U.S.C. § 1125; violation of 17 U.S.C. § 512(f); and defamation. Bird-X has responded with counterclaims, alleging false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), as well as federal and common law trademark infringement. Each side has moved for summary judgment on certain claims. For the following reasons, Milo's motion is denied, and Bird-X's motion is granted in part and denied in part.

# I.    Local Rule 56.1

Before considering the facts underlying these motions, the Court must consider which facts have been properly presented for the purpose of summary judgment. Motions for summary judgment in the Northern District of Illinois are governed by Local Rule 56.1. "The obligation set forth in Local Rule 56.1 'is not a mere formality.' Rather, '[i]t follows from the obligation imposed by Fed. R. Civ. P. 56(e) on the party opposing summary judgment to identify specific facts that establish a genuine issue for trial.'" *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)). The Seventh Circuit has "routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 537 (7th Cir. 2011) (quotation omitted). In this case, because the parties have filed cross-motions, each must comply with Local Rule 56.1(a), which governs filings by the moving party, and 56.1(b), which governs filings by the opposing party.

## A.    Milo's Motion for Partial Summary Judgment

"To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'" *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (citations omitted). For example, the Court cannot consider inadmissible hearsay. *Id.* What is more, a party filing a motion for summary judgment must include a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party

2

to a judgment as a matter of law," where each paragraph contains "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." LR 56.1(a)(3)(B). Failure to properly submit such a statement "constitutes grounds for denial of the motion." *Id.*

Here, Milo's Statement of Material Fact does not comply with Local Rule 56.1(a). Indeed, Milo cites only two documents throughout its Statement of Fact: A Declaration by Benjamin Hung (Milo's own attorney), and a Declaration by Michael Liu, Milo's Chief Executive Officer (CEO). *See generally* Pl.'s Statement of Material Fact ("PSOF"), ECF No. 120; Pl.'s Mot. Partial Summ. J., Ex 2, Decl. of Benjamin Hung ("Hung Decl."), ECF No. 119-2; Pl.'s Mot. Partial Summ. J., Ex 2, Decl. of Michael Liu ("Liu Decl."), ECF No. 119-3. But as Bird-X points out, these affidavits are replete with hearsay, improper legal conclusions about the use of copyrighted material and trademarks, and speculation beyond the witnesses' personal knowledge—meaning they would not be admissible at trial. *See* Def.'s LR 56.1 Statement Material Fact and Resp. PSOF ("DSOF") at 14–21, ECF No. 126. And Milo, in its own reply brief and response to Bird-Xs' statement of facts, failed to respond to that argument. *See generally* Pl.'s Resp. DSOF, ECF No. 132. Such "[f]ailure to respond to an argument . . . results in waiver."[1] *Bonte v. U.S. Bank, N.A.,*

---

[1]     It bears noting that even if Milo had responded to Bird-X's arguments, the Court's ruling would be the same. Bird-X correctly noted that Milo's affidavits are riddled with evidentiary deficiencies. Hung's affidavit, for example, purports to authenticate multiple documents without any foundation as to how they were found or what search criteria were used to find them. And much of his affidavit is irrelevant—as explained below, there is no justiciable copyright issue in this case, but Hung attempts to offer an exhibit relating to a search of the copyright database. *See* Hung Decl. at 6. And at any rate, the fact that only Milo's attorney attests to the authenticity of these documents raises issues under the

3

624 F.3d 461, 466 (7th Cir. 2010). Accordingly, all paragraphs relying on affidavits from Hung or Liu are stricken as noncompliant. *See, e.g., Bielawski v. Midland Funding LLC*, No. 18 C 2513, 2019 WL 4278042, at *3 (N.D. Ill. Sept. 10, 2019) (Lee, J.) (striking a portion of movant's Local Rule 56.1 Statement of Material Fact for lack of support with admissible evidence). The remaining paragraphs in Milo's Statement of Material Fact cite no support at all.

Thus, Milo's motion for summary judgment entirely fails to comply with the requirements of Local Rule 56.1(a)(3)(B). Accordingly, Milo's motion for partial summary judgment is denied.

## B. Milo's Response to Bird-X's Motion for Summary Judgment

Turning to Milo's response to Bird-X's motion, Local Rule 56.1(b)(3)(B) requires the nonmovant to file a "concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *See* LR 56.1(b)(3)(B). Local

---

"advocate-witness rule," which "bars a lawyer from acting as both an advocate and a witness in the same proceeding except under special circumstances." *United States v. Jones*, 600 F.3d 847, 861–62 (7th Cir. 2010). As for Liu's declaration, it contains almost exclusively legal conclusions about whether Milo has infringed on third parties' intellectual property rights and whether the company has suffered injury as a result of this lawsuit. *See* Liu Decl. ¶¶ 1– 12. But "[o]pinions that amount to legal conclusions do not assist the trier of fact, and expert testimony that is 'largely on purely legal matters and made up of solely legal conclusions' is not admissible." *Client Funding Sols. Corp. v. Crim*, 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013) (quoting *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)). While the Court need not reach these issues in light of Milo's waiver, the Court is confident that any response Milo would have given, even if it proved *some* evidence admissible, would not be enough to cure the gross insufficiencies in Milo's Local Rule 56.1 Statement of Facts, and the motion for partial summary judgment would still be dismissed as noncompliant.

Rule 56.1(b)(3)(C) also "requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement . . . of any additional facts that require the denial of summary judgment.'" *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005) (quoting LR 56.1).

The failure of a nonmoving party to abide by the rule's requirements carries significant consequences. "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." LR 56.1(b)(3); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "This rule may be the most important litigation rule outside statutes of limitation because the consequences of failing to satisfy its requirements are so dire." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).

Here, too, Milo failed to comply with these procedural requirements. Although Milo filed a response to Bird-X's statement of facts, *see* Pl.'s Resp. DSOF, that response contains virtually no "specific references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(B). Rather, nearly all of Milo's denials state only: "Milo, based on Bird-X's reckless and illegal history, does not take at face value anything from Bird-X, or Joe Seid [Bird-X's sales director] including statements made in pleadings before this Court. Milo lacks information otherwise to form a belief." *See*, *e.g.*, Pl.'s Resp. DSOF at 3. This response, devoid of citations to the record, is insufficient to constitute a denial under Local Rule 56.1.

Other of Milo's responses to Bird-X's Statement of Facts rely on the same inadmissible affidavits as Milo's own statement of facts and similarly fail to comply

with Local Rule 56.1. *See* Pl.'s Resp. DSOF at 7 (citing Hung Decl.). Accordingly, all statements by Bird-X to which Milo responded in the manner discussed above are deemed admitted as "[un]controverted by the statement of the opposing party." LR 56.1(b)(3). A handful of Milo's responses do deny Bird-X's statements on the grounds that the statements find no support in the record. *See*, *e.g.*, Pl.'s Resp. DSOF at 7–9. The Court will review the underlying record for these paragraphs, noting disputes as necessary.

## II. Background[2]

Milo and Bird-X are corporations that sell pest repellant products. DSOF ¶¶ 1–2. Milo sells under a variety of wholesaler names, including the name "Aspectek." *Id.* ¶ 1. The company's founder, Michael Liu, is its Director and President, and lives in Canada. *Id.* ¶ 18. He previously owned and operated Longwell Electronics, a Taiwan-based company that manufactured certain Bird-X products until 2015. *Id.* ¶ 20. His son, Anthony Liu, is Milo's Chief Executive Officer. *Id.* ¶ 19.

As relevant here, both Milo and Bird-X sell products marked with renderings of predator eyes which, when inflated and hung, are intended to scare birds away. *Id.* ¶¶ 9, 24–30. Bird-X has a trademark for its line of frightening visual bird repellants, which are marked as "SCARE-EYE" products. *Id.* ¶ 7. This trademark is the impetus for much of the instant litigation.

---

[2] The following facts are undisputed or deemed admitted, unless otherwise noted.

6

Bird-X has been selling bird repellant products under the SCARE-EYE mark since at least 1987 and sells these products online with both Amazon and Home Depot. *Id.* ¶¶ 9–10. Milo also sells its bird repellant balloons online, including through Amazon's and Home Depot's websites. *Id.* ¶¶ 23, 31.

Since at least 2015, Milo has sold a line of balloons under the brand name "VisualScare." *Id.* ¶¶ 24–25; *see also* Seid Decl., Ex E, 9/23/15 Bayona Email, ECF No. 126-1 (acknowledgment of VisualScare line by Milo employee). The product description for one balloon in the VisualScare line includes the language "Visualscare Bird Scary Eye Balloons." *See* MILO 000022 Amazon Listing at 3, ECF No. 126-9.

In April 2015, an employee of Bird-X, Sales Director Joe Seid, submitted a complaint to Amazon about Milo's use of the term "Scary Eye" in its Amazon sales listing, believing that it was an infringement of Milo's "SCARE-EYE" trademark. DSOF ¶ 42. His complaint led Amazon to remove the images from Milo's Scary Eye Balloon listing. *Id.* ¶¶ 43–44.

In 2017, Seid again noticed Milo's use of "Scary Eye" in online sales listings for Milo's bird repellant balloons, as well as the use of the terms "Scare Eye" in their product descriptions. *Id.* ¶¶ 46–47. Seid responded by submitting three more complaints to Amazon—two in 2017 and another in 2018—stating that Milo's Amazon listings infringed Bird-X's intellectual property rights.[3] *Id.* At least one of

---

[3] While the majority of Seid's emails reference the "SCARE-EYE" trademark, his March 2018 complaint to Amazon claimed that Milo infringed on Bird-X's "copyright Scare Eye." DSOF ¶ 50. It is undisputed that this was a mistake stemming from Seid's lack of understanding of the difference between copyright and trademark. *Id.* ¶ 51.

7

Milo's listings was removed from Amazon.com in response to Seid's complaints. *Id.* ¶ 55. This led to communication between Seid and an Aspectek employee, regarding the alleged infringement, in which Seid stated that "[t]he Chinese government is looking for Anthony and Michael Liu for tax evasion, I will tell them their location in Canada." DSOF ¶ 70.

In addition to Amazon, Seid also reached out to Home Depot to complain that Milo's online VisualScare balloon sale listings with Home Depot infringed Bird-X's trademark rights. *Id.* ¶ 65. In one such email to Home Depot representatives, Seid stated:

> A Chinese Company called Aspectek has copied Bird-X products (many) and are also using trademarked names.
>
> We know they are Chinese (based in Canada now) because they used to run one of our factories in China before disappearing to avoid Chinese government prosecution for failing to pay taxes.
>
> . . .
>
> They have literally just copied our items and now offer them on HomeDepot.com. . . . BELOW are 6 products that infringe on Bird-X products and are direct knockoffs. [4]

Despite these emails, Home Depot did not suspend Milo's listings or stop selling the VisualScare balloons on its website. *Id.* ¶ 66.

After Seid's communications with Amazon and Home Depot, Milo filed this action, seeking a declaratory judgment that they are not infringing Bird-X's

---

[4] To back up these statements, Bird-X has offered documents from the Taiwan Taipei District Court stating that Michael Liu, under the name Liu Hongchuan, was "publicly prosecuted . . . for fraud" in 2007. DSOF ¶ 67; DSOF, Ex 13, Taiwan Taipei District Court Decision at 1, ECF No. 126-14; DSOF, Ex. 3, M. Liu Deposition at 304:13–24, ECF No. 126-4.

trademark, copyright, or trade dress. *See* Second Amended Compl. ("SAC") ¶¶ 54–74, ECF No. 66. Milo also brought claims of tortious business interference; *see id.* ¶¶ 75–83; federal unfair competition under the Lanham Act, 15 U.S.C. § 1125; *see* SAC ¶¶ 84–86; misrepresentation of copyright claims under the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512(f); *see* SAC ¶¶ 87–97; and defamation. *Id.* ¶¶ 98–123. Bird-X responded with counterclaims of federal and common law trademark infringement; *see* Bird-X Answer ¶¶ 14–17; ECF No. 36; and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a). *See* Bird-X Answer ¶¶ 12–13. Having stricken Milo's motion for summary judgment for the reasons described, the Court now considers Bird-X's motion for summary judgment.

## II.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The

9

nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)).

To satisfy that ultimate burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). Where, as here, the parties have filed cross-motions, courts "look to the burden of proof that each party would bear on an issue of trial." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## III.   Analysis

In its motion, Bird-X contends that it is entitled to summary judgment  as to all of Milo's claims, as well as its counterclaim of federal trademark infringement.

## A.   Trademark infringement

The Court first considers whether summary judgment is appropriate on Milo's claim seeking a declaratory judgment of trademark noninfringement. "To prevail on [a claim of trademark infringement], a plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 595 (7th Cir. 2019). But even once a case of infringement is established, "[u]nder 15 U.S.C. § 1115(b)(4), a defendant . . . may invoke the fair use defense by demonstrating that the alleged

infringement 'is a use, otherwise than as a mark . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of such party.'" *Sorensen v. WD-40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015) (quoting § 1115(b)(4)). To prevail on a fair use defense, "a defendant must show that: (1) it did not use the mark as a trademark; (2) the use is descriptive of its goods or services; and (3) it used the mark fairly and in good faith." *Id.* at 722.

Because a genuine dispute of material fact as to the viability of the fair use defense would preclude summary judgment for Bird-X irrespective of whether it can prove the elements of trademark infringement, the Court proceeds directly to the fair use analysis.

## 1. Use as a trademark

Words or phrases are "used" as trademarks "when [they are] used by a source of a product to identify itself to the public as the source of its product and to create in the public consciousness an awareness of the uniqueness of the source and of its products." *SportFuel*, 932 F.3d at 596 (quoting *Sorensen*, 792 F.3d at 722–723). To decide whether a term is being used as a trademark, the Seventh Circuit assesses multiple factors, including: (1) whether the phrase is used with a company's "house mark"; (2) how prominently it is displayed compared to the house mark; (3) whether the phrase is used on all of its product packaging, or only in certain advertisements; and (4) whether the slogan is "catchy"—that is, whether it is meant to stick in a customer's head and create an association with the source. *Id.* at 598.

11

These factors do not provide a clear answer when applied to this case. Milo's use of "Scary Eye" alongside its product line name "VisualScare" would weigh in favor of a finding that Milo used it as a trademark.[5] DSOF ¶ 17; *see also* DSOF, MILO000020 at 1, ECF No. 126-9 (reflecting a listing on Amazon's website for VisualScare balloons, and the term "scary eye" in the product title). And unlike in *SportFuel*, Milo used "Scary Eye" in association with a specific product (bird repellant balloons), as opposed to only "on in-store displays and other advertisements." *SportFuel*, 932 F.3d at 598; *see also Sorensen*, 792 F.3d at 723–24 (7th Cir. 2015*)* ("[A] mark that is used on only one product within a larger line can nevertheless be a source indicator, not for the whole line, but for that product in particular.").

But the remaining factors suggest that Milo was not using the phrase as a trademark. Specifically, "scary eye" is not displayed any larger or smaller than "VisualScare" or the other descriptions of the product. *See* DSOF, MILO000020 at 1–2. This could suggest to a reader that it is no more or less important (or more or less associated with the product) than the rest of the product name or description. And nothing about "Scary Eye" stands out as catchy, playful, rhyming, or rhetorical in a way that is intended to create "a memorable slogan that is uniquely associated with [Milo's] product." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 954 (7th Cir. 1992). Accordingly, a genuine dispute of material fact exists as to whether Milo uses "Scary Eye" as a trademark.

---

[5] Although Milo's motion for summary judgment was stricken because its statement of facts did not comply with the local rules, the Court notes that Bird-X did not contest that Milo owns a trademark for "VisualScare." *See* Def.'s Resp. PSOF ¶ 11, ECF No. 126.

12

## 2.     Descriptive use

Turning to the second element of the fair use defense, phrases are "descriptive" within the meaning of the fair use exception where the term "names a characteristic of a product or service." *Sorensen*, 792 F.3d at 724. Descriptive use of a term is not a trademark violation; "[t]his rule ensures that competitors can market their products by describing them. . . . [and] reflects that descriptors are a poor means to distinguish among competing products." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 420 (7th Cir. 2019) (citations omitted). This is a context-dependent analysis. *See Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1059 (7th Cir. 1995); *see also Uncommon*, 926 F.3d at 725 (noting that the question of whether "delicious" was a descriptive term in the *shoe* market would be well-suited for the jury, whereas the question of whether the term "corrosion inhibitor" was clearly a descriptive term in the hardware market could fairly be decided on summary judgment).

Some considerations in the descriptiveness analysis include "how, and how often, the relevant market uses the word in question[,] . . . [whether] a mark imparts information directly [or] . . . stands for an idea which requires some operation of the imagination to connect to the goods," and dictionary definitions. *Uncommon*, 926 F.3d at 422–423; *see also Sunmark*, 64 F.3d at 1058 (considering, in the descriptiveness analysis, that "[b]oth sweet and tart are words of description in ordinary English").

Here, too, when the record is viewed in the light most favorable to Milo, it gives no clear answer as to whether the use of "scary eye" is descriptive. As for the use of

"scare" and "eyes" in the market, Milo fails to offer any of its own evidence (beyond Liu's impermissible legal conclusions) that these terms are widely used by competitors in the bird repellant market. This would suggest that Milo's use is not descriptive. On the other hand, Bird-X's own exhibit shows a third-party vendor using the term "scary eyes balloons." *See* DSOF, MILO000020 at 2–3 (listing under "Compare with similar items" a product sold by "Tried-and-True Products" with the title "Balloon Bird Repellant . . . Scary Eyes Balloons Keep Birds Away"). From this, a reasonable jury could infer that other market participants use the term "scary eyes," making descriptive use more likely.

An examination of the other factors leads to similarly mixed results. Favoring a finding of descriptive use is that scary and eyes are both being used according to their commonly understood definitions—the balloons are literally using depictions of eyes to scare away birds. Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at 9, ECF No. 131. But the term "scary eyes" certainly does not immediately invoke the category of bird repellant balloons. The inferential step from "scary eyes" on a product to scaring away birds may be enough to prevent the items from being descriptive. *See Life After Hate, Inc. v. Free Radicals Project, Inc.*, 410 F. Supp. 3d 891, 904 (N.D. Ill. 2019) (holding that the organization name "Life After Hate" was not descriptive because "a consumer would need to use their imagination to determine the nature of services provided by an organization called Life After Hate," rather than immediately knowing it was an organization to help people who decided to leave hate groups); *see also Kastanis v. Eggstacy LLC*, 752 F. Supp. 2d 842, 849 (N.D. Ill. 2010) (holding that

14

even though "yolk" was being used in accordance with its dictionary definition—meaning "the yellow center of an egg"—"[t]he word 'yolk' is not a generic term for a restaurant serving breakfast food and egg based dishes"). Accordingly, there is a genuine issue of material fact as to whether the term "scary eye" is used descriptively.

### 3.     Good Faith

Finally, the good faith element of the fair use defense "look[s] to [the alleged infringer's] subjective purpose in using a slogan." *SportFuel*, 932 F.3d at 600. Although it is relevant, "[m]ere knowledge of [a] trademark . . . is insufficient to establish that the [alleged infringer] acted in bad faith and to preclude summary judgment." *Packman v. Chicago Trib. Co.*, 267 F.3d 628, 642 (7th Cir. 2001).

Here, Bird-X's only argument that Milo did not act with good faith is that Milo was aware of Bird-X's trademark on the term "SCARE-EYE" and continued marketing its "scary eye" product anyway. Bird-X also mentions—although unconnected with the good faith analysis—that Michael Liu, Milo's Director and President, used to manufacture Bird-X's products. DSOF ¶¶ 18–20. But *SportFuel* teaches that this is not enough to undisputedly show bad faith.

In *SportFuel*, the alleged infringer had a prior acrimonious business relationship with the trademark holder and used the allegedly infringing phrase even after it knew about the existing trademark. *See SportFuel*, 932 F.3d at 600–601. The court found that these factors were insufficient to create an inference of bad faith. *Id.* at 601; *see also Sands*, 978 F.2d at 962 ("Even the defendant's refusal to cease using the mark upon demand is not necessarily indicative of bad faith. Absent more, courts

should not make an inference of bad faith from evidence of conduct that is compatible with a good faith business judgment.")

Of course, the facts in *SportFuel* do not mirror precisely the facts here—the prior business relationship in *SportFuel* had ended ten years prior to the alleged trademark infringement, *see* 932 F.3d at 594, whereas, here, the alleged infringement began in the same year that the prior business relationship ended. *See* DSOF ¶¶ 20, 22. The shorter time between the end of the prior relationship and the alleged infringement makes an inference of bad faith more plausible. But the record is insufficient to find bad faith as a matter of law. The question of subjective intent in this case is one for the jury.[6]

Because a genuine issue of material fact exists as to fair use, Bird-X's motion for summary judgment in its favor as to its counterclaim of trademark infringement and Milo's trademark noninfringement claim is denied.

## B. Milo's Claim of Noninfringement of Copyright and Trade Dress

Milo also seeks declaratory judgments of noninfringement of copyright and trade dress. *See* 15 U.S.C. § 1051 *et seq.*; 28 U.S.C. §§ 2201; 2202. In its motion, Bird-X maintains that Milo lacks standing to bring these claims, arguing that Milo's concerns about copyright infringement and infringement of trade dress lack the

---

[6] It bears noting that the only in-district case Bird-X raises ruled on subjective intent after an evidentiary hearing. *See Mitek Corp. v. Pyramid Sound Corp.*, No. 91 C 20152, 1991 WL 292621, at *3 (N.D. Ill. July 9, 1991). Just as the court in *Mitek* was able to make these assessments after a hearing at which credibility could be assessed, a jury here should be able to review the evidence before making a determination of Milo's subjective intent.

16

"immediacy and reality to warrant the issuance of a declaratory judgment." *Bell v. Taylor*, 827 F.3d 699, 711 (7th Cir. 2016).

A real and immediate threat of litigation is necessary because, "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). And so the claimant's injury must be "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). In the context of copyright, the Seventh Circuit has held that where one party is no longer infringing on another's copyright, and shows no signs of doing so again, a declaratory judgment of infringement is not appropriate. *See Bell*, 827 F.3d at 711.

In response to Bird-X's argument, Milo insists that there is an actual or imminent risk of litigation over copyright infringement based on prior statements by Seid. *See* DSOF ¶ 40; Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at 19, ECF No. 131. Milo insists that because Seid mentioned "copyright" in his emails to Amazon, there is sufficient "immediacy and reality to warrant the issuance of declaratory judgment." *Bell*, 827 F.3d at 711.

But it is undisputed that Seid did not understand the differences between copyright and trademark when corresponding with Amazon. DSOF ¶ 51. Accordingly, any potential for a copyright infringement suit based solely on his statements to Amazon could be no more than an empty threat. And even if it had been a legitimate threat at the time Seid sent those emails—March, 2018, as both parties have agreed, *see* DSOF ¶ 50–51—there is certainly no real or immediate

threat that Bird-X will bring such a suit now. Indeed, both parties have stated as much. *See* Pl.'s Mem. Supp. Mot. Partial Summ. J. and Opp. Def.'s Mot. Summ. J. ("Pl.'s Resp. Mem."), ECF No. 131 at 19; Def.'s Mem. Opp Pl.'s Partial Mot. Summ. J. at 16, ECF No. 122. Where there is no threat of infringement litigation at the time of the declaratory judgment action, then there are no grounds to bring that action. 827 F.3d at 711. Thus, summary judgment for Bird-X is granted as to Milo's noninfringement of copyright claim.

Milo's claim for noninfringement of trade dress has even less basis. Indeed, in responding to Bird-X's contention that it has no trade dress claim and does not intend to assert one, Milo states only that Bird-X "has previously raised complaints based on rights it did not have." Pl.'s Resp. Mem. at 25. But that is exactly the type of "conjectural or hypothetical" injury that cannot establish standing. *Lujan*, 504 U.S. at 560. Summary judgment for Bird-X on the noninfringement of trade dress claim is granted as well.

## C.    Milo's Tortious Interference Claim[7]

Milo's tortious interference with business relationships claim requires it to prove: "(1) the existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; (2) the knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *360*

---

[7]    The parties assume that Illinois law applies to the common law claims, and so too will the Court.

*Painting, LLC v. R Sterling Enters., Inc.*, No. 20-CV-4919, 2021 WL 3603626, at *5 (N.D. Ill. Aug. 13, 2021) (quoting *Am. Guardian Warranty Servs., Inc. v. Auto. Prot. Corp., Inc.*, No. 16 CV 11407, 2019 WL 6130813, at *3 (N.D. Ill. Nov. 19, 2019)).

As a defense to such a claim, Illinois law "recognize[s] a privilege in [certain tort] cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's . . . rights." *KMK Grp. LLC v. Helco Corp.*, No. 18 C 6361, 2021 WL 4499496, at *1 (N.D. Ill. Aug. 18, 2021). Accordingly, a party's statement to a third party cannot be the basis for a tortious interference claim if they made that statement in a good faith effort to protect another legal interest, like a trademark interest.

Milo argues Bird-X tortiously interfered with its business relationships with Amazon and Home Depot by notifying them of Milo's alleged infringement of Bird-X's intellectual property rights. In response, Bird-X contends that those communications were privileged because they were a good faith attempt to protect the SCARE-EYE trademark. Milo has not responded to this argument in any way and, accordingly, has waived it. *Bonte*, 624 F.3d at 466. On this basis alone, Bird-X has established that they are entitled to summary judgment as to Milo's tortious interference with business relationships claim.

But even if the Court were to reach the merits of its argument, Milo has failed to produce any evidence that Bird-X was acting with the intent to interfere with Milo's business relationships, as opposed to with the intent of protecting its own financial interests. *See Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 375 (7th Cir. 1992)

19

("Interference designed to protect one's financial interest is generally privileged."). Indeed, Bird-X has offered Seid's unrebutted testimony indicating that his communications with Milo's business partners were an effort to protect Bird-X's property rights. DSOF ¶ 51. Milo does not point to a single piece of evidence that might give rise to the opposite inference. Accordingly, Milo's tortious interference claim fails on the merits as well.

## D. Milo's DMCA Claim

The DMCA, 17 U.S.C. § 512, provides that "[a]ny person who knowingly materially misrepresents . . . that material or activity is infringing [a copyright], . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, . . . as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing." As relevant here, to prove a violation of this statute, a plaintiff must show that: (1) a defendant knew he was materially misrepresenting that an activity was infringing;[8] and (2) that the material misrepresentation caused the plaintiff's harm.

---

[8]    Although the Seventh Circuit has yet to interpret the requirements of § 512(f), the only other court in this district to consider the issue has held that liability under the DMCA requires actual knowledge that a misrepresentation is being made. *See Sunny Factory, LLC v. Chen*, No. 21 C 3648, 2022 WL 742429, at *4 (N.D. Ill. Mar. 11, 2022) ("It cannot be that Congress intended broad punitive authority to curtail inaccurate notifications of copyright infringement without proof of knowing and intentional misrepresentation."). Many courts outside of this circuit have considered the issue and held the same. *See, e.g., Ouellette v. Viacom Int'l, Inc.*, 671 F. App'x 972 (9th Cir. 2016) (holding that "some showing of actual knowledge" is necessary); *White v. UMG Recordings, Inc.*, No. 20 CIV. 9971 (AT), 2021 WL 6052106, at *2 (S.D.N.Y. Dec. 21, 2021) (cleaned up) (collecting cases) ("[C]ourts in this Circuit require plaintiffs to show "actual knowledge[.]" . . . [N]egligence is not the standard for liability under § 512(f)."); *see also Tuteur v. Crosley-Corcoran*, 961 F. Supp. 2d 333, 344 (D. Mass. 2013). This Court agrees that a knowing misrepresentation is required to show a

Milo insists that summary judgment on this claim is not warranted because "exhibits on record show that Bird-X knowingly misrepresented to Amazon.com that it had copyrights which were being infringed by Milo." Pl.'s Resp. Mem. at 22. But Milo does not point to any evidence that would support even a passing inference of a knowing representation by Bird-X. In fact, it is uncontroverted that the only reason the word "copyright" was mentioned in any of Bird-X's takedown notices was because Seid did not understand the difference between a copyright and a trademark. *See* DSOF ¶ 51. Accordingly, Bird-X is entitled to summary judgment as to Milo's DMCA claim.[9]

## E.    Milo's Defamation Claim

Next is Milo's defamation claim. "Under Illinois law, the elements of a defamation claim . . . are 'that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages.'" *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1102–03 (N.D. Ill. 2016) (citations omitted).[10] No

---

violation of the DMCA.

[9]    For the sake of completeness, the Court notes that Milo's DMCA claims must be dismissed with respect to Bird-X's statements to Home Depot. Milo has not shown any injury with respect to those statements. It is undisputed that Milo had no interruption in its sales with Home Depot, even after Bird-X contacted Home Depot alleging trademark infringement. Seid Decl. Ex. M, 126-2. In response to Bird-X's email claiming that their intellectual property was being infringed by Milo, the Home Depot representative stated plainly: "We will not be removing any [of Milo's] items at this time." *Id.* And Milo makes no effort to respond to this point or to offer evidence of injury. Accordingly, Milo has no standing to bring its DMCA claims as to Bird-X's communications with Home Depot, and this Court may not rule on that claim. *See Lujan*, 504 U.S. at 560.

[10]    In this case, damages would be presumed, because the allegedly defamatory statements described the commission of a crime. *See Doctor's Data*, 170 F. Supp. 3d at 1103

statements are actionable, however, that are "reasonably capable of an innocent construction." *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). As relevant here, "[a] statement that may innocently or reasonably be construed as referring to a person other than the plaintiff cannot be actionable." *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008). Whether a statement is reasonably capable of innocent construction is a question of law. *Id.* Moreover, true statements cannot support a defamation claim—and a statement need only be "substantially true" to avoid liability. *NPF Racing Stables, LLC v. Aguirre*, No. 18 C 6216, 2021 WL 1379494, at *7 (N.D. Ill. Apr. 12, 2021) (citing *Seitz-Partridge v. Loyola Univ. of Chi.*, 987 N.E.2d 34, 41 (Ill. App. Ct. 2013)).

There are three statements that could give rise to a defamation claim against Bird-X.[11] The Court considers each in turn.

First, in his January 6, 2018 email to a Milo employee, Seid stated that "[t]he Chinese government is looking for Anthony and Michael Liu for tax evasion." DSOF ¶ 70. This claim fails at the first step because Milo cannot prove that Bird-X "made a false statement about the plaintiff."—that is, about Milo. *Doctor's Data*, 170 F. Supp. 3d at 1102–03. The allegation that the Chinese government intends to

---

n.16 (N.D. Ill. 2016); DSOF ¶¶ 67–73.

[11]     Although Milo insists that there could be a "multitude of other false accusations and defamatory statements to third parties," they fail to list even one beyond the three proposed by Bird-X. Pl.'s Resp. Mem. at 23. Indeed, the only piece of evidence they point to is a search of the copyright office database. *See* Hung Decl., Ex. A, ECF No. 119-2. To that end, the Court analyzes only the three statements addressed by Bird-X.

prosecute Michael and Anthony Liu is a statement about the Lius, not their company. Summary judgment on this defamation claim is granted.[12]

Milo encounters the same problem with Seid's statement to Home Depot representatives in the November 1, 2017 email. In that email, Seid said "[w]e know they are Chinese (based in Canada now) because they used to run one of our factories in China before disappearing to avoid Chinese government prosecution for failing to pay taxes." DSOF ¶ 71. Bird-X argues that this statement is clearly about the Lius and not about Milo as a company. Milo responds that "they" could as easily refer to the company as to the Lius. *See* Pl.'s Resp. Mem. at 24. But where a statement can just as easily be innocent as defamatory, the innocent construction rule requires the Court to give the statement its non-defamatory meaning. *See Madison*, 539 F.3d at 654. Thus, this second statement cannot give rise to a claim for defamation, and summary judgment for Bird-X is appropriate as to this statement.[13]

Third, Milo brings a claim of defamation over another statement made by Seid on November 1, 2017 to Home Depot representatives. Seid stated in his email "they

---

[12]     Milo has not, in any of its pleadings or responses, explicitly pointed to evidence showing that this allegation is false. That alone calls into question Milo's ability to bring a successful defamation claim. *See Glob. Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 982 (7th Cir. 2004) (clarifying that the First Amendment requires that the Milo bear the burden of proving that a statement is false for the purposes of a defamation claim). The Court presumes the statement is false for the sake of a complete analysis.

[13]     However, even if these were not reasonable readings of Bird-X's first two statements, the defamation claims still would fail. Bird-X has raised the affirmative defense that these statements were all "substantially true," pointing to evidence that Michael Liu was prosecuted in 2007—but for fraud rather than tax evasion, and by the Taiwanese government, rather than the Chinese government. DSOF ¶ 67. Milo has failed to respond to this argument at all and, accordingly, has waived it. *Bonte*, 624 F.3d at 466. Thus, summary judgment is proper for Bird-X on these grounds as well.

have literally just copied our items and now offer them on HomeDepot.com . . . BELOW are 6 products that infringe on Bird-X products and are direct knockoffs." Just as with the second statement, the innocent construction rule requires the Court to read this statement as referring to the Lius rather than to the plaintiff, Milo. Accordingly, summary judgment is warranted as to this statement as well.

## F.  Unfair Competition

Finally, "[t]o prevail on [an unfair competition claim under 15 U.S.C. § 1125], a plaintiff must be able to show (1) that its mark is protectable, and (2) that the defendant's use of that mark is likely to cause confusion among consumers." *Phoenix Ent. Partners v. Rumsey*, 829 F.3d 817, 822 (7th Cir. 2016).

Milo has not offered any evidence that Bird-X is appropriating its intellectual property as described in *Phoenix*. Rather, Milo's claim seems to be that Bird-X's cease and desist letters were misleading and harmed Milo's business. *See* SAC ¶ 85. But Milo points to no case suggesting that this is sufficient to state a claim of unfair competition under the Lanham Act, which requires ownership of a protectable trademark and proof of likelihood of confusion among consumers. *See Phoenix*, 829 F.3d at 822.

And indeed, even if this theory did present a plausible case for federal unfair competition, Milo fails to respond to any of Bird-X's legal or factual arguments, including Bird-X's argument that the cease-and-desist letters were sent in good faith, and "unfair competition claims [cannot be] based on good faith efforts to enforce intellectual property rights." *Heinz v. Frank Lloyd Wright Found.*, 762 F. Supp. 804,

806–07 (N.D. Ill. 1991). As the party that will bear the burden of proof on unfair competition at trial, Milo's failure to respond to these legal or factual contentions means they have not met their burden on summary judgment. *See LaRiviere*, 926 F.3d at 359. Thus, summary judgment for Bird-X must be granted as to this claim as well.

## IV.     Conclusion

For the reasons stated above, Milo's motion for partial summary judgment is denied. Bird-X's motion for summary judgment is denied with respect to its claim for trademark infringement and Milo's claim of non-infringement. In all other respects, Bird-X's motion for summary judgment is granted.

**IT IS SO ORDERED.**                    ENTERED: 3/24/22

_____
**John Z. Lee**
**United States District Judge**

25

Case No. 07 C 3312
United States District Court, N.D. Illinois, Eastern Division

# Wehrs v. Benson York Group, Inc.

Decided Sep 23, 2011

Case No. 07 C 3312.

September 23, 2011

## OPINION AND ORDER

JOAN LEFKOW, District Judge

On June 14, 2007, plaintiff Williams R. Wehrs, Jr. filed a complaint seeking damages from his former securities broker, Benson York Group, Inc., Benson York employees Kevin Brennan and Kevin Wells, and New Castle Financial Services, LLC, the corporation formed subsequent to Benson York's dissolution.[1] The complaint alleged that Benson York, New Castle, Brennan and Wells are liable for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as common law negligence, fraud, and breach of fiduciary duty. After Wells and the other named defendants failed to appear, answer, or otherwise plead to the complaint, the court on September 14, 2009 entered a default judgment against them. The court later vacated the judgment against defendants New Castle and Brennan, and those parties eventually settled with Wehrs.

2   Wells's motion to vacate was denied as to *2 liability but granted on the issue of damages, which is now before the court on Wehrs's motion for summary judgment. For the reasons stated below, Wehrs's motion [#153] is granted.

> 1   The complaint also named North American Clearing, Inc. as a defendant. North American was dismissed on March 19, 2008. Dkt. No. 41.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed.R.Civ.P. 56(c) advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the nonmoving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. Id. at 324; Insolia v. Philip Morris Inc., 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. Insolia, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is



insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## FACTS

3    To the extent the facts stated in the submissions on the motion are undisputed, yet inconsistent with allegations of the complaint, the court accepts the submissions on the motion. Otherwise, the consequential admissions of fact are the facts alleged in Wehrs's original *3 complaint, as default was entered for failure to plead to that version of the complaint. The court has also considered the facts sworn to in Wehrs's first affidavit submitted in support of the default judgment. *See* Dkt. No. 64.

## I. The Purchase and Sale of CYBX Shares

4    Wells is a stockbroker who was employed by Benson York (now New Castle) from 2004 to 2006. Wehrs was Wells's client. On June 23, 2005, Wehrs, pursuant to Wells's recommendation, placed an order for 4,000 shares of Cyberonics, Inc. ("CYBX"), on margin, [2] at a price of $43.75 per share.[3] Wehrs placed a $7,500 stop loss on the order. The stop loss would limit the amount of any loss to Wehrs's account to no more than $7,500.[4] *4

> [2]    When an investor purchases stock on margin, he borrows a portion of the cash that is required to make the purchase by using his own investment as collateral. *See* Securities and Exchange Commission, *Investor Tips: Margin — Borrowing Money To Pay for Stocks*, http://www.sec.gov/investor/pubs/margin.htm (referred to herein as "Margin Investor Tips").
>
> [3]    Wells asserts that he was directed to purchase 4100 shares of CYBX. *See* Wells Aff. ¶ 5; Wells's Verified Answer to Second Amended Compl. (hereinafter "Verified Answer") ¶ 11. Given the default that was entered against Wells, the court must accept the well-pleaded allegations in Wehrs's complaint. *See Black* v. *Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994); *see also* Fed.R.Civ.P. 8(b)(6) ("An allegation — other than one relating to the amount of damages — is admitted if a responsive pleading is required and the allegation is not denied."). The complaint asserts that Wells was only directed to purchase 4000 shares.
>
> [4]    The parties agree that Wells placed a "$7,500 stop loss" on the order and that the stop loss would limit Wehrs's losses to $7,500. *See* Compl. ¶ 9; Wells Aff. ¶ 5; Verified Answer ¶¶ 11, 12. Usually, a "stop-loss order" refers not to the total amount of money that may be lost but rather to the "stop price" at which a broker is instructed to place a market order to sell the stock. *See* Securities and Exchange Commission, *Stop Order*, http://www.sec.gov/answers/stopord.htm. The stock will then be sold at the best available price. *Id.*; *see also* Securities and Exchange Commission, *Market Order*, http://www.sec.gov/answers/mktord.htm. The price at which a market order will be executed cannot be guaranteed: if the market is moving rapidly, the execution price may be significantly lower than the stop price. *See* Securities and Exchange Commission, Office of Investor Education and Advocacy, *Investor Bulletin: Trading Basics* (Mar. 2011), *available at* http://www.sec.gov/investor/alerts/trading101basics.pdf; Mary Pilon, Karen Blumenthal Jason Zweig, *When 'Stop Loss' Trades Backfire on Investors*, WALL ST. J., May 15, 2010. Therefore usually an investor has no guarantee as to the total amount of money that may be lost. For the purpose of resolving the pending motion, however, the court accepts the parties' assertions that Wells agreed to limit the losses on Wehrs's account to $7,500.

On June 24, 2005, Wells purchased for Wehrs's account 4,100 shares of CYBX on margin at a market price of $46.99 per share, for a total purchase price of $192,659. Wells charged Wehrs a commission of $2.33 per share. The total amount charged to Wehrs's account, including commissions, was $202,215.[5]

> [5]    There is a $3 difference between the sum of the purchase price and commission charge (which equals $202,212) and the amount charged to Wehrs's account. *See* Wells Ex. A at 3.



On June 27, 2005, Wells sold the stock for $44.33 per share. Wehrs was charged a $100 commission. Wehrs's account was credited $181,650.[6] According to the complaint, this sale was made without authorization from Wehrs. Wells, however, testifies that the shares were sold automatically pursuant to the stop loss.

6   There is a $3 difference between the amount credited to Wehrs's account and the purchase price minus the commission charge. *See* Wells Ex. A at 3.

Later that day, Wells repurchased 4,100 shares of CYBX on margin for the same price of $44.33 per share. Wehrs was charged a commission of $2.19 per share. The total amount charged to Wehrs's account was $190,735.[7] The complaint alleges that Wehrs did not authorize this transaction.[8]

7   As with the other transactions, there is a $3 difference between the amount charged to Wehrs's account and the sum of the purchase price and commission charge.

8   Wells asserts that Wehrs called him after the CYBX stock was sold and directed him to repurchase the stock without a stop loss. Wells Aff. ¶ 5; Verified Answer ¶ 15. Wells's default precludes him from contesting Wehrs's well-pleaded allegation that the repurchase was unauthorized.

The complaint alleges that, once Wehrs learned of the purchase and repurchase of the CYBX stock, Wehrs immediately attempted to contact Wells and Brennan. Compl. ¶ 14. Wehrs left telephone messages for Wells that were not returned. *Id.* On July 15, 2005, Wehrs and Wells spoke on the phone. *Id.* Wells told Wehrs that
5   any losses to the account would be *5 reversed on July 18, 2005, because CYBX had received FDA approval for its product and the stock would rise to $65 per share as a result. *Id.*

CYBX did not increase in value on July 18 or thereafter. Rather, it began to decline in price and was sold pursuant to margin calls.[9] The complaint alleges that Wehrs then "engaged in a series of communications with [Benson York], Wells, and Brennan, regarding the losses suffered." *Id.* ¶ 16. Wells and Brennan told Wehrs that the commissions charged to his account in connection with the purchase and re-purchase of CYBX would be reversed, that any stock sold on margin would be repurchased for Wehrs's account, and that CYBX would eventually increase in value. *Id.* ¶ 18. Wehrs alleges that whenever he "contacted Wells or Brennan . . . to sell the stock, [Wells and Brennan] provided promises and representations to make [Wehrs] whole for his losses." *Id.* ¶ 21.

9   If an investor's equity in his account falls below a certain required maintenance margin (such as 50%), the broker issues a "margin call," which requires the investor to either liquidate some of his stock or add cash to his account. If the investor does not answer a margin call, the broker has the right to sell his securities until the account reaches the maintenance margin. *See* Margin Investor Tips.

Wells attests that Wehrs never directed or authorized him to sell any stock after June 27, 2005. He asserts that "control of Wehrs' account was taken from me by Benson York's supervisor Kevin Brennan on August 17, 2005 based on Wehrs' complaints to him." Wells Aff. ¶ 11. Wells claims that he had "no ability" to sell Wehrs's stock after Brennan took control of the account and that he had no further communications with Wehrs after this
6   happened. *Id.* [10] *6

10   Wehrs does not contest these assertions in a counter-affidavit but rather asserts that these facts go to Wells's liability and that this issue has already been resolved against Wells by default judgment.

On September 26, 2005, the commission that Wehrs had been charged in connection with the repurchase of CYBX stock was reversed. Wehrs received a credit of $8,979 to his account.[11] All but 85 shares of the CYBX stock were subsequently sold pursuant to margin calls. Wehrs's account was credited a total of $133,855 from



the sales. On July 2, 2009, the last 85 shares were sold for $1,398.

> 11    The complaint, at paragraph 28, alleges that defendants Benson, Wells and Brennan promised, among other things, that
> the commissions charged for the unauthorized purchase and re-purchase of the CYBX shares would be credited to
> Wehrs's account in the amount of $18,532. Paragraph 19 alleges defendants failed to fulfill this promise.

## II. Procedural History

The following procedural history is relevant to the court's consideration of Wehrs's motion. Wehrs filed suit against Wells, Brennan, Benson York, and New Castle on June 14, 2007. The case was stayed from May 30, 2008 to June 3, 2009. (The defendants appealed from the court's denial of their motion to compel arbitration but ultimately dismissed the appeal.) On August 13, 2009, defendants' attorney was granted leave to withdraw. After defendants failed to answer the complaint or appear in court, the court entered a default judgment against them based on the prove-up affidavit of Wehrs. Soon thereafter, New Castle and Brennan, by new counsel, filed motions to vacate. These motions were granted on November 17, 2009. On December 7, 2009, Wells, representing himself, filed his motion to vacate the default judgment. The court denied Wells's motion to vacate as to liability but permitted him to rebut the amount of damages claimed by Wehrs. Dkt. No. 101. The court specifically allowed plaintiff to rebut allegations that Wehrs's losses were in excess of $92,000.

Wehrs filed a first amended complaint on January 22, 2010 and a second amended complaint on July 22, 2010. Following the filing of the second amended complaint, the parties *7 commenced settlement discussions. All defendants, including Wells, were present at these discussions. Brennan and New Castle settled Wehrs's claims for $27,499, and on October 15, 2010, they were dismissed with prejudice as defendants in this case. Dkt. No. 144. Wells was not able to reach an agreement with Wehrs. After newly retained counsel entered an appearance for Wells, the parties agreed to submit the issue of damages to the court by motion for summary judgment.

## ANALYSIS

## I. Scope of the Claims Under Consideration

A default judgment establishes, as a matter of law, that the defendant is liable to the plaintiff for each cause of action alleged in the complaint. *Breuer Elec. Mfg. Co.* v. *Toronado Sys. of Am., Inc.*, 687 F.2d 182, 186 (7th Cir. 1982). The facts alleged in the complaint in support of a cause of action may not later be contested by the defaulting party. *Black* v. *Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994); *Thomson* v. *Wooster*, 114 U.S. 104, 5 S. Ct. 788, 29 L. Ed. 105 (1885); *see also* Fed.R.Civ.P. 8(b)(6). Courts recognize, however, that "[j]udgment by default may be granted only for such relief as may lawfully be granted upon the well-pleaded facts of the complaint." *Taulton* v. *Wright*, No. 3:93-CV-520RM, 1995 WL 853119, at *2 (N.D. Ind. Aug. 2, 1995) (citation and quotation omitted). Therefore the entry of default judgment does not preclude the court from examining the sufficiency of the facts alleged in the complaint. *Black*, 22 F.3d at 1399; C. Wright, A. Miller, M. Kane, R. Marcus, 10A *Federal Practice and Procedure* § 2688 ("[E]ven after default it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action. . . .").

This court granted judgment based on the admitted allegations of the complaint and a prove-up affidavit of Wehrs but did not specify which claims within the complaint were *8 established by Wehrs's undisputed averments. This was an incomplete disposition of the case, as the court should have determined which claims had been established. *See Black*, 22 F.3d at 1399; *Larance* v. *Bayh*, No. 3:94-cv-182RM, 1995 WL 46718, at *1 (N.D. Ind. Jan. 18, 1995). Moreover, that omission causes difficulty in resolution of the damages issues briefed by the parties because the measure of damages in federal securities fraud cases must be allocated among participants in the fraud. *See* Private Securities Litigation Reform Act of 1995, 15 U.S.C § 78u-4(f)(7)(B);



*Laperriere* v. *Vesta Ins. Grp., Inc.*, 526 F.3d 715, 719-20 (11th Cir. 2008); *Ray* v. *Citigroup Global Markets, Inc.*, No. 03 C 3157, 2004 WL 1794927, at *1-4 (N.D. Ill. Aug. 4, 2004); Donald L. Langevoort, *The Reform of Joint and Several Liability Under the Private Securities Litigation Reform Act of 1995: Proportionate Liability, Contribution Rights and Settlement Effects*, 51 BUS. LAWYER 1157 (Aug. 1996). This is not true of the common law claims as awards of damages are typically joint and several against all wrongdoers.

It takes little examination to conclude that the well pleaded allegations of the original complaint, even as supplemented by Wehrs's affidavit, do not establish a claim for violation of § 10(b) or Rule 10b-5. To prove a violation, Wehrs must establish that Wells (1) made a false statement or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) on which Wehrs justifiably relied, and (6) that the false statement proximately caused Wehrs's damages. *See Caremark, Inc.* v. *Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir. 1997) (citations omitted). Here, the only statement Wehrs identifies that might have caused him damages is Wells's representation on July 15, 2005 that "any losses suffered in my account would be reversed on Monday, July 18, 2005, because CYBX had received FDA approval for its product, and the stock would rise to $65.00 per share on July 18, 2005." Compl. ¶ 14; Wehrs Aff. ¶ 5. Other allegations about promises made by Wells are general allegations *9 against all defendants and fail to specify the "who, what, when, where and how" of the fraud. Moreover, these representations pertained to unfulfilled promises by one or more defendants to give redress to Wehrs for the unauthorized transactions and were not a fraud in themselves. In any event, Wehrs does not allege that he took any action or failed to take action in reliance on Wells's representation. Thus, neither the complaint nor the prove-up affidavit supports the allegation of § 10(b) and Rule 10b-5 violations alleged. Unauthorized transactions may be unlawful under other sections of the securities laws, but this court is not in the business of searching for something Wehrs has not alleged. Wehrs's claim for common law fraud also fails for failure to plead the requisite facts with sufficient particularity as to Wells.

The allegations in Wehrs's complaint appear to support common law claims for breach of fiduciary duty and negligence. A "securities broker is a broker employed to buy or sell securities *for a customer*, and therefore the broker is the customer's agent. Because the broker is the agent and the customer is the principal, they are in a fiduciary relationship as a matter of law." *Khan* v. *BDO Seidman, LLP,* 948 N.E.2d 132, 157, 408 Ill. App. 3d 564, 350 Ill. Dec. 63 (2011) (internal citations and quotation marks omitted).[12] The duty of care owed by a broker carrying a nondiscretionary account for a customer is an "exceedingly narrow one, consisting at most of a *10 duty to properly carry out transactions ordered by the customer." *Index Futures Grp., Inc.* v. *Ross,* 557 N.E.2d 344, 348, 199 Ill. App. 3d 468, 145 Ill. Dec. 574 (1990). The Second Circuit has concluded that this means that, "[o]n a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale." *de Kwiatowksi* v. *Bear, Stearns Co., Inc.*, 306 F.3d 1293, 1302 (2d Cir. 2002); *accord Khan*, 948 N.E.2d at 151; *see also Anspacher Assocs., Inc.* v. *Henderson*, 854 F.2d 941, 945 (7th Cir. 1988).[13] Failure to execute a customer's order faithfully, provide competent advice regarding a transaction, or notify the customer of a sale would undoubtedly be a breach of that duty. The same principles can be applied to a claim for negligence against a securities broker. *See Ross*, 557 N.E.2d at 348; *de Kwiatowksi*, 306 F.3d at 1303-07. The facts alleged in the complaint would establish that Wells breached a duty owed to Wehrs by failing to faithfully execute the first purchase order, failing to execute the $7,500 stop loss order, and repurchasing the stock without Wehrs's authorization. Therefore Wells can be liable for damages that were the proximate result of these actions.



12   Neither party addresses choice of law issues with respect to Wehrs's state law claims. Federal courts, reasoning by
     analogy to diversity cases, apply the choice of law rules of the forum state to supplemental state law claims. *Baltimore
     Orioles, Inc.* v. *Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986). Under Illinois law, a choice of
     law analysis is only required if there is a conflict of laws and the difference will affect the outcome of the case.
     *Townsend* v. *Sears, Roebuck Co.*, 879 N.E.2d 893, 899, 227 Ill. 2d 147, 316 Ill. Dec. 505 (2007). Here, the actions
     complained of occurred in New York, and Benson York was a New York corporation. Under New York law, as in
     Illinois, a securities broker has a limited fiduciary duty to notify the customer before making sales and to execute
     requested trades. *See Indep. Order of Foresters* v. *Donald, Lufkin Genrette, Inc.*, 157 F.3d 933, 940-41 (2d Cir. 1998).
     The elements for a cause of action for breach of fiduciary duty are also the same under both New York and Illinois law.
     *Compare Meisel* v. *Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009), *with Autotech Tech. Ltd. P'ship* v.
     *Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006). Because there is no conflict of laws, the court applies Illinois
     law to Wehrs's claims.

13   On the other hand, a broker does not have a general fiduciary duty to provide ongoing advice. *Khan*, 948 N.E.2d 132.

Because the court's original jurisdiction derived from Wehrs's Exchange Act claims, the court must also consider whether it is proper to retain jurisdiction over the supplemental state law claims given that the federal claims fail on the face of the complaint. *See Groce* v. *Eli Lilly Co.*, 193 F.3d 496, 500 (7th Cir. 1999). In doing so, the court analyzes the factors set forth in 28 U.S.C. § 1367(c) and whether "the values of judicial economy, convenience, fairness, and comity" provide a basis for retaining jurisdiction. *Id.* (quoting *City of Chicago* v. *Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997)); *Brazinski* v. *Amoco *11 Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). Wehrs's common law claims do not raise novel or complex issues of state law. *See* 28 U.S.C. § 1367(c)(1). Nor do they "substantially predominate" over the federal securities claims. *See id.* § 1367(c)(2). Moreover, the court and the parties have already invested significant time and resources into this case and, given that the only remaining issue to be decided is damages, it would be inefficient to return the case to state court. Taking the foregoing into account, judicial economy and fairness are best served by retaining jurisdiction over Werhs's state law claims.

## II. Calculation of Damages

The measure of damages for Wehrs's claims for breach of fiduciary duty and negligence is to restore him to the position he would have been in had the breach of the applicable standard of care not occurred. *See Restatement (Second) of Torts* § 874 (2d ed. 1979). "Although upon default the factual allegations of a complaint relating to liability are taken as true, allegations in a complaint relating to the amount of damages suffered ordinarily are not." *United States* v. *Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989); *Dimmitt Owens Fin., Inc.* v. *United States*, 787 F.2d 1186, 1189 (7th Cir. 1986); Fed.R.Civ.P. 8(b)(6). The defaulting party may also raise the issue of proximate cause as it relates to the calculation of damages. Robert M. Bloom, 10 *Moore's Federal Practice* § 55.32[c] (discussing *Trans World Airlines, Inc.* v. *Hughes*, 449 F.2d 51, 70 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973)). The defaulting party may not, however, dispute that proximate cause has already been established with respect to liability. *Greyhound Exhibitgroup* v. *E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992); *see also Trans World Airlines*, 449 F.2d at 70. Judgment by default may be entered without a hearing if the damages can be determined from definite figures contained in detailed affidavits or other *12 documentary evidence. *Dundee Cement Co.* v. *Howard Pipe Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983).

Wehrs asserts that he suffered a loss of $97,445 as a result of Wells's conduct. This is equal to the total loss from the first sale of CYBX plus the losses that resulted from the later sales on margin call. Wehrs asserts that Wells is entitled to a credit of $8,979, the value of one of the commissions that was refunded to Wehrs's



account, plus $1,398, the amount Wehrs received from the sale of the final 85 shares. Wehrs calculates that his total loss after credits is $87,068, and then subtracts the amount already paid by the settling defendants. Wehrs's calculation does not take into account that Wehrs directed Wells to purchase a certain amount of CYBX on June 23, 2005, however. It also fails to consider the $7,500 stop loss. Moreover, neither party has cited any cases that address damages for breach of fiduciary duty or negligence in a factual situation analogous to the one presented here.

This leaves the court in the awkward position of calculating damages in an area in which it has no guidance. Thus, the court will enter judgment in favor of Wehrs and against Wells as set out below. If either party wishes to move under Rule 59(e) to alter or amend the judgment, he may do so. Any such motion must be based on a rationale that is consistent with the court's ruling on the scope of the facts and legal claims under consideration.

## A. Damages Resulting from the Purchase and Sale of CYBX

On June 23, 2005, Wehrs directed Wells to purchase 4000 shares of CYBX at $43.75 per share, which would have amounted to a total authorized purchase of $175,000. Instead, on June 24, Wells purchased 4100 shares of CYBX at $46.99 per share, for a purchase price of $192,659, excluding commissions. Wells is liable to Wehrs for $17,659 for the first purchase of CYBX, which is the difference between the purchase authorized by Wehrs

13     and the purchase Wells made. *13

Wells also charged Wehrs a commission of $2.33 per share when he executed the order. Wells is liable to Wehrs for an additional $233, which equals the portion of the commission that can be attributed to the 100 unauthorized shares.

Four days later, on June 27, 2005, Wells sold the stock at $44.33 per share, and Wehrs's account was credited $181,650, including a $100 commission charge. Wehrs's account suffered a loss of $20,565, which is equal to the amount charged to his account as a result of the purchase of CYBX ($202,215) minus the credit received from the sale ($181,650). Wells is not liable for the $100 commission for the June 27 sale. The undisputed facts show that the shares Wells was authorized to purchase would have been sold in any event, pursuant to the stop loss ordered by Wehrs. Furthermore, Wells only breached his duty to Wehrs to the extent that he allowed Wehrs's losses to exceed the $7,500 stop loss amount. Wells is liable for $12,965 with respect to the June 27 sale, which is equal to Wehrs's total loss ($20,565), credited $8,500 for the stop loss amount and sale commission.

On June 27, Wells repurchased 4100 shares of CYBX at the same price, $44.33 per share, for a total purchase price of $181,756, including what appears to be a $3 transaction fee. Wells charged Wehrs a commission of $2.19 per share for a total commission of $8,979. Wehrs's account was later credited for the full amount of this commission, and Wehrs concedes that Wells is not liable for the value of the commission.

As the value of CYBX declined, all but 85 shares were sold to repay the margin loan used to purchase the stock. Wehrs's account was credited $133,855 from the sales. Wehrs sold the last 85 shares for $1,398 in July 2009. Excluding commissions, Wehrs's account suffered a loss of $46,503 as a result of Wells's repurchase of the stock on June 27, which is the difference between the total purchase price and the total sale price ($181,756

14     — ($133,855 + $1,398)). *14

Wells argues that he is not liable for losses that occurred after June 27, 2005 because Wehrs failed to mitigate damages by selling the stock in a timely manner. *See, e.g.*, *McCurnin* v. *Kohlmeyer Co.*, 347 F. Supp. 573, 579 (E.D. La. 1972) (customer had duty to minimize damages that resulted from unauthorized commodities purchase by liquidating his position). The duty to mitigate is an affirmative defense, which Wells waived when



he failed to answer or otherwise plead to the complaint. *See Kensington Rock Island Ltd. P'Ship* v. *Am. Eagle Historic Partners*, 921 F.2d 122, 125 (7th Cir. 1990); Arthur R. Miller Mary Kay Kane, 5 *Moore's Federal Practice* § 1278; 22 *Am. Jur. 2d Damages* § 698; Fed.R.Civ.P. 8(c). Wells also waived his right to assert the affirmative defense that Wehrs ratified the transaction by failing to direct him to sell the CYBX stock even after it was clear that Wells had made an unauthorized purchase. *See Restatement (Second) of Agency* § 416.

Taking the foregoing into account, the total loss that resulted from Wehrs's unauthorized actions amounts to $77,360. Wehrs agrees that Wells is entitled to a credit in the amount of $27,499 received from the settling defendants. *See Restatement (Second) of Torts* § 885(3). Therefore Wells is liable for $49,861.

## B. Prejudgment Interest

Wehrs argues that he is entitled to prejudgment interest at a rate of 5% per year pursuant to the Illinois Interest Act. *See* 815 Ill. Comp. Stat. § 205/2. The Interest Act does not provide for the award of prejudgment interest in negligence cases. *Westchester Fire Ins. Co.* v. *Gen. Star Indem. Co.*, 183 F.3d 578, 585 (7th Cir. 1999); *Wilson* v. *Cherry*, 612 N.E.2d 953, 958, 244 Ill. App. 3d 632, 184 Ill. Dec. 77 (1993). A court may, however, make an equitable award of prejudgment interest for breach of fiduciary duty. *Westchester Fire Ins.*, 183 F.3d at 585; *In re Estate of Wernick*, 535 N.E.2d 876, 888, 127 Ill. 2d 61, 129 Ill. Dec. 111 (1989). The rationale is \*15 that a defendant who breached his fiduciary duty should not be able to retain the benefit he received, in the form of profits and interest, from wrongly obtained funds. *Wernick*, 535 N.E.2d at 888. Prejudgment interest is applied out of concern for fairness and equity rather than as a mechanism for penalizing the defendant for his conduct. *Id.* Courts awarding equitable prejudgment interest therefore look to the extent to which the wrongdoer benefitted from his breach of the applicable duty of care. *See, id.* at 888; *NC Ill. Trust Co.* v. *First Illini Bancorp, Inc.*, 752 N.E.2d 1167, 1178, 323 Ill. App. 3d 254, 256 Ill. Dec. 925 (2001); *In re Marriage of Pitulla*, 559 N.E.2d 819, 832, 202 Ill. App. 3d 103, 147 Ill. Dec. 479 (1990). Here, Wells received no financial benefit from his wrongdoing. He was removed from Wehrs's account and effectively prevented from taking any corrective action that might have been requested by Wehrs. Wehrs, on the other hand, chose to retain his investment long after it became clear that CYBX would not increase in price. Equity does not warrant the award of prejudgment interest in these circumstances.

## CONCLUSION AND ORDER

Wehrs's motion for summary judgment as to damages [#153] is granted. The Clerk is directed to enter judgment in favor of plaintiff and against defendant Wells in the amount of $49,861.00. Costs are allowed to the plaintiff. The claim for prejudgment interest is denied.

casetext
Part of Thomson Reuters