**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MFB Fertility Inc., a Colorado Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2023-cv-03854 |
| | ) | |
| v. | ) | Dist. Judge John J. Tharp Jr. |
| | ) | Mag. Judge Gabriel A. Fuentes |
| Action Care Mobile Veterinary Clinic, LLC, a | ) | |
| Maryland limited liability company, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MOTION TO COMPEL DISCOVERY RESPONSES

Plaintiff MFB Fertility, Inc. ("MFB") moves under Federal Rules of Civil Procedure 37 to compel Defendant, Action Care Mobile Veterinary Clinic, LLC ("Action Care"), to provide complete and legally compliant responses to MFB's Interrogatories and Requests for Production.

### 1. Preliminary Statement and Relevant Factual Background

This is a Motion to Compel Responses to Interrogatories Nos. 20, 22 and 34 and Requests for Production ("RFPs") Nos. 30, 35 and 36. These requests pertain solely to Action Care's damages claims. Counsel met and conferred pursuant to Local Rule 37.2 but Action Care has refused to supplement. Copies of Action Care's Responses to Discovery are attached as **Group Ex. 1.**

Even though Action Care filed its Counterclaims on September 22, 2023 (Document No. 15), and all of its claims are premised on the allegation that MFB's alleged wrongful conduct caused a catastrophic business loss that directly resulted in Action Care discontinuing a new product line within months of its first sale, it nevertheless has objected to providing information or documents supporting its damages claims asserting, *inter alia*, that such discovery is "premature

at this stage of the litigation" and will be produced "in due course." Such objections (if they can even be deemed that) completely undermine the purpose of pre-trial discovery, especially given that the alleged wrongful act occurred almost three (3) years ago. Defendant is refusing to provide the most basic of information necessary for this case to move forward with depositions or motion practice.

Action Care cannot have it both ways. It cannot make the wide-ranging damage allegations that it has over the past three years and then, when asked to produce any information or documents related to its damage claim prior to the deposition of its client, refuse to do so on the grounds that it's premature and will be provided in due course. To the extent Action Care has confidentiality concerns, the parties have entered into an Agreed Protective Order.

## 2. Legal Authorities

As this Court held in *CenturyLink Commc'ns LLC v. Peerless Network, Inc.,* No. 18 C 3114, 2020 WL 11647732, at *1 (N.D. Ill. Sept. 18, 2020), when ruling on a motion to compel, the discovery standard set forth in Rule 26(b) applies. Rule 26(b)(1) allows "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "If the discovery appears relevant, the party objecting to the discovery request bears the burden of showing why that request is improper." *Trading Technologies Int'l., Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2005 WL 1300778, at *1 (N.D. Ill. Apr. 28, 2005) (citing, *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004)).

It is equally well settled under the "new business rule," that expected profits of a new commercial business are too uncertain, speculative, and remote to permit recovery. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc*., 491 F.3d 625, 633 (7th Cir. 2007). The same holds true for new product lines. *Id.* at 634 (7th Cir. 2007) ("Illinois courts likewise have held that

the new business rule applies with equal force to new products which create potential new business for the entity.")

### 3.  Relevant Factual Background

MFB researches, develops, and sells in-home tests for fertility tracking purposes. Plaintiff's founder and CEO, Dr. Amy Beckley, is a scientist with a PhD in Pharmacology and is a nationally recognized fertility expert. In 2016, after experiencing her own fertility challenges, Dr. Beckley invented a test that measures the presence of progesterone metabolites in urine and allows women to confirm successful ovulation by tracking progesterone (PdG) levels at home.[1]  MFB sells these products under the trademark PROOV®. Products offered under the PROOV brand were the first to obtain FDA clearance as an at-home ovulation confirmation test and have been utilized by tens of thousands of women across the United States to assist with ovulation confirmation.

Action Care is a house-call veterinary practice based in the state of Maryland. In 2023, seven years after MFB created its product, Action Care decided to launch a new business line: selling its own home ovulation progesterone testing product, calling it OVUPROOF.

Action Care's first sale under the name OVUPROOF occurred on or about May 7, 2023. On June 19, 2023, Plaintiff filed its copyright and trademark complaint. Within six (6) months, Action Care voluntarily abandoned its new product line and never sold (or attempted to sell) an ovulation test strip again. Its stated reason for doing so, among others: "Action Care assessed the marketplace and determined that it was no longer economically sound proposition for Action Care to sell the SEB Strips online due to a variety of factors" and "Action Care did not deem it to be an

---

[1] Ovulation test strips measure the presence of progesterone metabolites in urine and allow women to confirm successful ovulation by tracking progesterone (PdG) levels at home.

economically sound proposition to pursue the sale of OVUPROOF branded SEB Strips on other online marketplace platforms during the pendency of this litigation." (Emphasis added)

### 4. Action Care's Damages Allegations and Admissions

From the outset, it has been Action Care's steadfast position that "*MFB's anticompetitive actions effectively drove Action Care out of the marketplace*." It has alleged that as a *direct* result of MFB's wrongful conduct it lost sales; the inability to distribute its product; the inability to maintain exclusive distribution rights; and suffered increased costs. It has stated in its interrogatory answers that "*MFB's actions, which resulted in Action Care's inability to sell its OVUPROOF brand products through Action Care's developed trade channels, resulted in a loss of market position and customer base*."

These allegations place Action Care's full financial condition at issue and discovery on these issues is essential to test Action Care's narrative of business collapse and causation. Moreover, the admission set forth below – in particular Action Care's *voluntary* abandonment of the OVUPROOF product line within months after Plaintiff filed its trademark claim – calls into question the credibility of its damages allegations, such that only the production of the requested information will permit Plaintiff to meaningfully challenge those claims:

> "Action Care's principal, Diane Krasznay, made the decision to abandon commercial development of the Shopify website *at buyovuproof.com*. The decision was made around January 2024. The reason for such abandonment was because Ms. Krasznay had seen how easy it was for someone like MFB to get a site taken down via a DMCA takedown notice."[2] (emphasis added) **Response to Interrogatory No. 17**

> "A launch of the website in a manner that would make the site an economically viable trade channel required significant additional investment in terms of development, maintenance, and promotion." (Emphasis added) **Response to Interrogatory No. 17**

---

[2] MFB never issued a takedown notice or in any other way sought to restrict Actions Care's website *buyovuproof.com* or its ability to sell its products on any other platform.

"Ms. Krasznay <u>chose not to spend the funds on maintaining the *buyovuproof.com* website</u>, given the high likelihood that MFB could seemingly get the site taken down through the submission of a DMCA takedown notice without regard for whether any content on the site was actually in any manner infringing on MFB's rights. chose to abandon its new product and never sought to sell it again." (Emphasis added) **Response to Interrogatory No. 17**

"…Action Care did, however, ultimately determine that it was not economically feasible to continue attempting to sell OVUPROOF brand products online for the foreseeable future. **Response to Interrogatory No. 18**

"Action Care assessed the marketplace and determined that it was no longer economically sound proposition for Action Care to sell the SEB Strips online <u>due to a variety of factors</u>." **Response to Admit No. 14** (Emphasis added)

"Action Care admits that Action Care did not deem it to be an economically sound proposition to pursue the sale of OVUPROOF branded SEB Strips on other online marketplace platforms during the pendency of this litigation." **Response to Admit No. 15**

Action Care admits that Action Care has no immediate plans to resume sales of SEB Strips online as a result of various circumstances that affect the economic proposition and viability of any such potential efforts. **Response to Admit No. 21**

## 5. The Objected to Discovery Requests

Ordinarily Plaintiff would not burden this Court with such a lengthy response, however, in this case, it is relevant to the lack of a recognizable objection, instead, using discovery responses as a means to reiterate its legal theories.

**<u>Interrogatory No. 20</u> -** State the total revenues, expenses, and net profits (or losses) of Action Care from 2022 to the present, identifying the source of the data.

### <u>Response to Interrogatory No. 20</u>

…Action Care objects to Interrogatory No. 20 to the extent it seeks information that is overly broad, unduly burdensome, or not proportional to the needs of the case. Action Care further objects to this Interrogatory to the extent that it suggests that Action Care's relief is limited to actual damages. However, in the spirit of cooperation, Action Care answers as follows: Aside from Action Care's e-commerce business selling the at-home PdG ovulation test strips, Action Care was engaged at all relevant times in business as a mobile veterinary clinic. <u>Action Care considers revenues and expenses generated through the mobile veterinary clinic</u>

vector of the business to be irrelevant for the calculation of any potential damages in this case…(Emphasis added)

**Interrogatory No. 22 -** State the total amount of damages you claim was caused by the alleged wrongful conduct of Plaintiff.

**Response to Interrogatory No. 22**

Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 22 to the extent that it suggests that Action Care is limited to seeking actual damages.

Furthermore, the Interrogatory seeks information that requires a detailed and comprehensive analysis, which is premature at this stage of the litigation. An appropriate calculation of damages involves complex issues that necessitate expert analysis and opinion, which Action Care intends to obtain in due course.

However, in the spirit of cooperation, Action Care answers as follows: Under 17 U.S.C. § 512(f), if liability is found, the violator "shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . as the result of the service provider relying upon such misrepresentation . . ." (Emphasis added.) "In drafting the statute, Congress did not limit damages to monetary loss or other forms of specific relief even though such limitations are included in other sections of the DMCA." *Signal 23 Television v. Anthony*, No. 1:17-CV-01452-SDG, 2020 WL 11206863, *3 (N.D. Ga. Sept. 1, 2020) (citing)

*Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1156 (9th Cir. 2016). "As a result, the damages an alleged infringer may recover under § 512(f) from 'any person' are broader than monetary relief." *Lenz*, 815 F.3d at 1156. Because "any damages" is broadly construed, such damages have been interpreted as being calculated by taking into account many different impacts, including lost revenues, loss of following, loss of ability to advertise and grow its audience, and the value of the time and effort spent responding to issues stemming from a takedown. See *Signal 23 Television*, 2020 WL 11206863, at *3.

Thus, while Action Care provides information relating to specific numbers of sales and profits generated during Action Care's brief ability to sell its products using Amazon (which can subsequently serve as a source of projection of potential revenues and profits during the period of Action Care's inability to sell via Amazon), as well as the expenses incurred in procuring inventory that ultimately was spoiled as a result of the inability to sell via Amazon, a more appropriate calculation of damages *suffered* by Action Care would also account for Action Care's loss of consumer base, loss of second-mover advantage, loss of the right to be the exclusive distributor of SEB Strips within the United States, and the time

and resources spent by Action Care in dealing with the repercussions of the meritless takedown.

Meanwhile, under the Sherman Act, the injured party "shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C.

§ 15(a). The Sherman Act also may result in an award of "simple interest on actual damages" for the period starting on the initial service of the Sherman Act claim and lasting through the date of judgment.

**Interrogatory No. 34 -** All documents sufficient to show revenues, expenses, and net profits (or losses) from sales of products under the "OVUPROOF" mark.

**Response to Interrogatory No. 34**

Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Request No. 34 to the extent that it is duplicative of MFB's other Requests. However, Action Care agrees to produce for review by MFB's attorneys using a secure file-sharing software by October 13, 2025, the following: screenshots of statements from Amazon and invoices from SEB. Action Care also intends to rely on documents identified in Action Care's initial disclosures, which documents are currently in MFB's exclusive possession. Action Care's investigation continues. Action Care is aware of its continuing duty to supplement responses under Rule 26(e).

**RFP No. 30 -** All documents that support the damages allegation in Para. 34 of Defendant's proposed First Amended Complaint that: "As a direct and proximate result of MFB's actions, Action Care has been injured substantially and irreparably. Such injury includes, but is not limited to, the financial and personal expenses associated with responding to the takedown notice, reputational damage resulting from a lower seller rating and lower account health, and lost revenues from an inability to sell Action Care's products through Amazon."

**Response to RFP No. 30**

Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Request No. 30 because Paragraph 34 of Action Care's proposed First Amended Complaint does not contain the stated language. Action Care further objects to this

Request to the extent that it is duplicative of other Requests. Action Care further objects to this Request to the extent that it calls for speculation. The Request seeks information that requires a detailed and comprehensive analysis, which is premature at this stage of the litigation. <u>An appropriate calculation of damages involves complex issues that necessitate expert analysis and opinion, which Action Care intends to obtain in due course</u>. Action Care's investigation continues. Action Care is aware of its continuing duty to supplement responses under Rule 26(e).

**RFP No. 35** - Defendant's state and federal tax returns for the years 2020-2024.

**Response to RFP No. 35**

Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Request No. 35 as being unduly burdensome, designed to harass, and not proportional to the needs of the case. Aside from its ecommerce business, Action Care has been engaged in business as a mobile veterinary clinic, which is not relevant to either side's claims or defenses. <u>The requested documentation would incorporate and reflect aspects beyond Action Care's ecommerce business</u>. Further, the time range of the documentation requested by MFB exceeds the time period of Action Care's ecommerce-related operations. (Emphasis added)

**RFP No. 36** - All documents evidencing Defendant's revenues, costs of goods sold, gross margins, operating expenses, net income, assets, liabilities, and cash flow including but not limited to Profit & Loss Statements (Income Statements), Balance Sheets and Cash Flow Statements for the years 2020-2024.

**Response to RFP No. 36**

Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Request No. 36 as being unduly burdensome, designed to harass, and not proportional to the needs of the case. Aside from its ecommerce business, Action Care has been engaged in business as a mobile veterinary clinic, which is not relevant to either side's claims or defenses. <u>The requested documentation would incorporate and reflect aspects beyond Action Care's ecommerce business</u>. Further, the time range of the documentation requested by MFB exceeds the time period of Action Care's ecommerce-related operations. (Emphasis added)

First, many of the "objections" are not objections at all—they are argument. Action Care, for example, argues that because the OVUPROOF product line is separate from Action Care's

primary business, the information sought from Action Care is irrelevant (<u>INT No. 20 and RFP 35 and 36</u>). Respectfully, this makes no sense. Action Care is the Counter-Plaintiff. Action Care is the entity claiming damages. Action Care is the only allegedly damaged party. OVUPROOF is not a company or division. Any attempt to separate the two is a fiction. See, *TAS Distrib. Co. v. Cummins Engine Co.,* 491 F.3d 625, 634 (7th Cir. 2007) ("Illinois courts likewise have held that the new business rule applies with equal force to new products which create potential new business for the entity.")

Second, financial information to challenge the damage claim is clearly relevant within the parameters of Rule 26(b)(1) without which MFB cannot meaningfully test Action Care's causation theory, analyze alternative explanations for its business difficulties, or prepare for depositions. For example:

- whether Action Care expected revenues from its veterinary practice to carry OVUPROOV during its rollout and until OVUPROOV was self-sustaining?

- whether Action Care was even a viable business prior to June 2023?

- whether its revenue or profitability was already declining for unrelated reasons?

- whether other business lines were failing?

- whether Action Care could have mitigated its damages?

- whether the alleged wrongful conduct was the proximate cause of its claimed collapse?

Third, "prematurity" is not an objection. Action Care objects to <u>INT. No. 22 and RFP 30</u> on the grounds that they are "premature at this stage of the litigation." Pre-trial discovery is *precisely* when such requests are appropriate. The fact that Action Care might obtain an expert to opine on damages does not, of course, provide a legal basis to withhold documents and

information. Moreover, any experts will review and analyze documents that are <u>currently in Action Care's possession</u>. Expert reports are not evidence, but Action Care's records are.

Lastly, Action Care states in response to <u>INT No. 34</u> ("All documents sufficient to show revenues, expenses, and net profits (or losses) from sales of products under the "OVUPROOF" mark") that "investigation continues." This is arguably a bad-faith answer. The documents requested either exist or they do not – especially given the fact that Action Care stopped selling the product almost three years ago.

Based on the foregoing, MFB respectfully requests that this Court grant Plaintiff's Motion to Compel and enter an Order requiring Action Care to:

a) Provide full responses to Interrogatories Nos. 20, 22 and 34 and Requests for Production Nos. 30, 35 and 36 on or before a date certain;

b) For movant's reasonable expenses incurred in making the motion, including attorney's fees pursuant to Federal Rule 37;

c) For any other relief this Court deems fair and just.

Dated: February 13, 2026

**MFB FERTILITY INC., A COLORADO
CORPORATION**

By: */s/ Gary I. Blackman*            
       One of Its Attorneys

Gary I. Blackman (ARDC # 6187914)
Levenfeld Pearlstein, LLC
120 S. Riverside Plaza, Suite 1800
Chicago, Illinois 60606
(312) 346-8380
(312) 346-8434 (Fax)
gblackman@lplegal.com

     and

Patrick R. Moran (ARDC # 6272747)
Rock Fusco & Connelly, LLC
333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
pmoran@rfclaw.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Gary I. Blackman, an attorney, hereby certify that on February 13, 2026, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF filing system, which will send notification of such filing to all attorneys of record.


*/s/  Gary I. Blackman*

# GROUP

# EXHIBIT 1

**THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MFB Fertility, Inc., | |
| Plaintiff, | Case No. 1:23-cv-03854 |
| v. | Dist. Judge John J. Tharp Jr. |
| Action Care Mobile Veterinary Clinic, LLC, | Mag. Judge Gabriel A. Fuentes |
| Defendant. | |

## ACTION CARE'S RESPONSES AND OBJECTIONS TO MFB'S INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION

Defendant/Counter-plaintiff Action Care Mobile Veterinary Clinic, LLC ("Action Care" or "Defendant"), by and through its attorneys, and pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure and the Rules of this Court, responds and objects to Plaintiff/Counter-defendant MFB Fertility, Inc.'s ("MFB" or "Action Care") Interrogatories dated September 4, 2025 ("MFB's Interrogatories"), Requests for Production of Documents dated September 4, 2025 ("MFB's Requests for Production"), and Requests for Admission dated September 4, 2025 ("MFB's Requests for Admission" and, together with MFB's Requests for Production, "MFB's Requests"), as follows:

## GENERAL OBJECTIONS AND RESPONSES TO MFB'S INTERROGATORIES AND MFB'S REQUESTS

In addition to the objections stated in the specific responses to MFB's Interrogatories and MFB's Requests, the following objections (collectively, "General Objections") apply to all of MFB's Interrogatories and MFB's Requests. The following General Objections are hereby incorporated by reference into the individual responses to MFB's Interrogatories and MFB's

Requests and have the same force and effect as if fully set forth in the responses to MFB's Interrogatories and MFB's Requests. Action Care objects as follows:

1.　　Action Care objects to MFB's Interrogatories and MFB's Requests to the extent that they seek information that is not relevant to any party's claim or defense.

2.　　Action Care objects to MFB's Interrogatories and MFB's Requests as improper, not proportional to the needs of the case, and unduly burdensome to the extent that they purport to impose upon Action Care any obligations or requirements broader than those set forth in the Federal Rules of Civil Procedure or rules otherwise applicable to this matter.

3.　　Action Care objects to MFB's Interrogatories and MFB's Requests to the extent that they are not limited in scope and timeframe in a manner that will result in production of information reasonably relevant to the subject matter of this proceeding.

4.　　Action Care objects to MFB's Interrogatories and MFB's Requests to the extent that they call for information that is a matter of public record or otherwise routinely available to all parties.

5.　　Action Care objects to MFB's Interrogatories and MFB's Requests to the extent that they are duplicative or designed to harass.

6.　　Action Care objects to MFB's Interrogatories and MFB's Requests to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the work product doctrine, or any other privilege or immunity from discovery. Inadvertent disclosure of any such privileged information shall not constitute a waiver of any applicable privilege or any other ground for objecting to discovery with respect to such privileged information.

7.     Action Care objects to MFB's Interrogatories and MFB's Requests to the extent that they seek information regarding documents or materials that are not in Action Care's possession, custody, or control.

8.     Action Care objects to MFB's Interrogatories and MFB's Requests to the extent that they state a legal conclusion, or assume or appear to assume that any fact, event, or assumption is true. By responding to any of MFB's Interrogatories and any of MFB's Requests, Action Care does not concede the correctness of any such conclusion or assumption.

9.     Action Care objects to MFB's Interrogatories and MFB's Requests on the grounds that they are unduly burdensome and premature in light of the fact that Action Care is still conducting discovery and that many of the facts are already known to MFB. Action Care's responses herein are necessarily based solely on the information that is available to Action Care on the date of these responses. Action Care's investigation is ongoing, and Action Care reserves the right to amend, supplement, or withdraw any response or objection to MFB's Interrogatories and MFB's Requests as Action Care deems necessary or appropriate in light of information or knowledge obtained as discovery progresses in this action. To the extent that any materials not discussed below are determined to be responsive to MFB's Interrogatories and MFB's Requests, Action Care will supplement Action Care's responses accordingly.

10.     In responding to MFB's Interrogatories and MFB's Requests, Action Care does not concede that any of the information provided is relevant or material to the subject matter of this litigation or reasonably calculated to lead to the discovery of admissible evidence. Action Care reserves the right to object to the admissibility at trial of any of the information produced in response to MFB's Interrogatories and MFB's Requests.

## SPECIFIC OBJECTIONS AND RESPONSES TO MFB'S INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail the facts and circumstances leading to Defendant's selection of the name "OVUPROOF" in association with products sold under the name "OVUPROOF" including but not limited to the inspiration and/or source materials used in making the selection, each person's participation in Defendant's selection, and all relevant dates upon which each act occurred.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. However, in the spirit of cooperation, Action Care answers as follows:

Action Care's principal Diane Krasznay was trying to think of a name that would reflect that the product is related to ovulation, which is the source for the "OVU" portion of the mark. Krasznay then thought to add "PROOF" to the mark because an ovulation test shows proof of ovulation. That is how the portmanteau/compound "OVUPROOF" mark originated. Krasznay then proceeded to search the USPTO website and other internet searches for the "OVUPROOF" name being used as a trademark. Not having found any records of "OVUPROOF" being used, Krasznay decided that the "OVUPROOF" mark was a good mark to use for Action Care's ovulation test strip products.

### INTERROGATORY NO. 2:

State the date on which Defendant first used the "OVUPROOF" mark in commerce in connection with any goods or services and identify the goods or services.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the generality of the General Objections, Action Care objects to Interrogatory No. 2 on the grounds

that the date of first use in commerce of the OVUPROOF mark and the associated services are all matters of public record available to all parties. However, Action Care answers as follows:

Action Care first used the "OVUPROOF" mark in commerce no later than May 7, 2023. Such first use in commerce was made in connection with ovulation test kits and in-vitro ovulation prediction test kits for home use.

**INTERROGATORY NO. 3:**

State when and how Defendant first became aware of Plaintiff's "PROOV" mark.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. However, Action Care answers as follows:

Action Care's principal Diane Krasznay first learned of MFB's (and/or Dr. Beckley's) product and ordered it from Dr. Beckley's Indiegogo campaign in January 2017. At the time, MFB's PdG strips were not branded as PROOV. To the best of Krasznay's recollection, they were called "The Ovulation Double Check Test." Ms. Krasznay does not recall the first time when she saw that MFB was selling the strips using the brand "PROOV," though Ms. Krasznay believes this occurred in 2022. The usage that Krasznay became aware of is PROOV's listing on Amazon.

**INTERROGATORY NO. 4:**

Identify any trademark searches, clearance opinions, or legal advice sought or received concerning the availability or registrability of "OVUPROOF."

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 4 to the extent that it concerns

communications that are properly subject to the attorney-client privilege and/or the work product doctrine. However, in the spirit of cooperation, Action Care answers as follows:

Action Care did not commission any formal clearance opinions or solicit legal advice from a licensed attorney prior to implementing the OVUPROOF brand. However, Diane Krasznay, in her capacity as principal of Action Care, searched the USPTO's online database to determine whether anyone else was using "OVUPROOF" (or some other mark that Krasznay may have deemed as potentially confusing for consumers) in relation with relevant products.

**INTERROGATORY NO. 5:**

Describe all marketing, advertising, or promotional efforts made using the "OVUPROOF" mark, including the channels of trade, target customers, and expenditures.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 5 to the extent that it seeks information that is overly broad or is not proportional to the needs of the case. Action Care further objects to Interrogatory No. 5 to the extent that it seeks (i) information that is publicly available or already known to MFB; or (ii) confidential business information or trade secrets. However, in the spirit of cooperation, Action Care answers as follows:

Action Care has engaged in various marketing, advertising, and promotional efforts using the OVUPROOF mark. These efforts have primarily focused on digital marketing channels, including the development of a website and an Amazon product listing page. The target customers for the OVUPROOF-brand products are individuals seeking in-home ovulation test strips, particularly those interested in tracking progesterone levels for fertility purposes. Action Care has participated in Amazon's Brand Registry and FBA program, which has

facilitated the distribution and promotion of Action Care's products. Additionally, Action Care has utilized the Amazon VINE review program to enhance product visibility and customer feedback.

In addition to the Amazon listing, Action Care sought to develop a website/online store through Shopify. Toward that end, Action Care engaged a digital marketing company called Website Shark, interfacing with the company's representative Chandler Orcutt. Action Care did not, however, ultimately launch PdG product sales through the Shopify store, because Ms. Krasznay was still trying to decide whether shipping would be done by herself individually, or whether to use Amazon's FBA (Fulfilled by Amazon) service for the Shopify sales. Furthermore, there was the issue of marketing, because at the time few (if any) people knew about the Shopify website. Ultimately, Ms. Krasznay decided to commit to using solely Amazon, because everything had already been set up for that purpose, the FBA service was convenient, and, of course, Amazon already had a much larger platform. Action Care chose to advertise directly on Amazon, as a result of which Action Care's sponsored listing would be seen because there were few competitors for the search term "PdG Strips." Ms. Krasznay is unaware of anyone other than MFB or Action Care who sold PdG strips in isolation at the time. Other merchants that sold PdG strips did not sell them separately from devices that were required to run the tests, and these products also included other hormones. The price point for such other products was in the hundreds of dollars per unit.

When the DMCA takedown notice was issued by MFB on Amazon, Ms. Krasznay tried to determine whether it was feasible to launch the Shopify store and also researched the potential of distribution through Walmart.com. However, upon learning that it would be just as simple for MFB to issue a DMCA takedown notification through those other

online platforms, Action Care did not pursue those other trade channels during the pendency of MFB's copyright infringement claim, as such other trade channels would have required significant additional investments of time and money, all of which would have been wasted if MFB chose to submit another DMCA takedown notification on those other platforms similar to how it had done on Amazon. For those reasons, when the time came for Action Care to renew Action Care's Shopify website subscription in early 2024, Action Care elected to abandon the Shopify site, because it did not seem worth the investment given how easy it was for MFB to leverage the DMCA to shut down Action Care's Amazon listing.

**INTERROGATORY NO. 6:**

Describe in detail the factual and legal bases relating to whether the overall impression created by the "OVUPROOF" name is, or is not, similar to the "PROOV" trademark in appearance, sound or meaning.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 6 to the extent that it calls for a legal conclusion or seeks information protected by the attorney-client privilege or work product doctrine. Action Care further objects to this Interrogatory as vague and ambiguous regarding the terms "impression" and "similar." Action Care also objects to this Interrogatory on the grounds that it seeks information that MFB already has in its possession or is otherwise in the public record. However, in the spirit of cooperation, Action Care answers as follows:

As written (and without accounting for how it sounds), "PROOV" is not a real word. Meanwhile, the word "PROOF," which is incorporated into Action Care's OVUPROOF mark, is a real English-language word. The purpose of using the word "PROOF" within the OVUPROOF mark is to suggest that the products can help test for, or serve as proof of, whether

8

the user has ovulated. The spelling difference between "PROOV" and its phonetic equivalent "PROVE" made Diane Krasznay view the PROOV mark as not being something that suggested "proof" of anything or suggesting that it was supposed to "prove" anything. The overall impression between the parties' respective marks, including their appearance, sound, and meaning, was that the two marks were different from each other. Once it became clear that MFB sought to use the PROOV mark to prevent Action Care (and, presumably, others) from using the word "PROOF" as part of their own branding, Action Care understood that "PROOV" also was supposed to convey that it would prove whether someone was ovulating, and that it sounded exactly the same as the word "PROVE." Action Care does not believe that any merchant selling testing products can monopolize the words "PROVE" or "PROOF" (or their phonetic equivalents).

**INTERROGATORY NO. 7:**

Describe in detail the factual and legal bases relating to whether the Plaintiff's products using the "OVUPROOF" name are or were sold in the same or similar stores or outlets or advertised in similar media as the Plaintiff's products and how the products provided by Defendant using the "OVUPROOF" name compete, or do not compete with, Plaintiff's product.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, Action Care objects to Interrogatory No. 7 to the extent that it seeks information that is publicly available or already known to MFB. Action Care further objects to this Interrogatory as vague and ambiguous regarding the terms "similar stores" and "compete" and refers to "Plaintiff's products using the 'OVUPROOF' name." However, in the spirit of cooperation, Action Care answers as follows:

At the time that MFB submitted its DMCA takedown notification to Amazon, Action Care had been selling its PdG products on Amazon for the brief period of around three

weeks. Action Care's products offered on Amazon were indeed directly competitive with MFB's at-home ovulation test strips that measured PdG and that did not require the purchase of a separate device to facilitate implementation of the ovulation tests. MFB also sold those products through Amazon's marketplace platform. After MFB issued its takedown notice and Action Care's listing was removed, Action Care sought to have the listing reinstated. After it became clear that Amazon would not reinstate Action Care's listing until there was a court order confirming that Action Care had not infringed MFB's rights, Action Care was forced to reassess Action Care's entire approach to the business model and potential expansion into other trade channels, given that such expansion would have required an investment of significant resources, and Action Care expected that MFB would proceed to submit a similar DMCA takedown notification on every other platform. Action Care is aware of its continuing duty to supplement responses under Rule 26(e).

### INTERROGATORY NO. 8:

State Defendant's gross revenues and net profits derived from the sale of SEB Strips under the OVUPROOF name and the dates of the sales.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 8 to the extent it seeks information that is overly broad, unduly burdensome, or not proportional to the needs of the case. However, in the spirit of cooperation, Action Care answers as follows:

Action Care's cost for the product including packaging for the initial order of 1000 units (i.e., boxes) was $7.50 per box. Action Care sold each box for $21.95. The fees charged by Amazon varied, ranging between no more than $6.50 per box and no less than $4.00

per box. Therefore, Action Care's net profit varied between $7.95 per box to $10.45 per box. That means that the profit margin for those early sales were between 36.2% and 47.6%.

Crucially, it is important to keep in mind that Action Care's future orders with SEB would have allowed Action Care to secure a higher net profit margin, because Action Care already had paid for 50,000 foil pouches (i.e., one foil pouch for each strip, with five foil pouches/strips in each box) and all packaging had been produced by SEB, based on Action Care's designs and direction. Subsequent orders would have only cost Action Care approximately $5.00 per box plus shipping. That would have increased the net profits by more than $2.00 per box. SEB also had indicated to Action Care that future discounts would be available for larger quantity orders. Action Care is aware of its continuing duty to supplement responses under Rule 26(e).

### INTERROGATORY NO. 9:

Identify any third-party marks you contend are similar to "PROOV" that you rely upon to argue Plaintiff's mark is weak or entitled to limited protection.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, to the extent that any third-party marks have been registered with the USPTO or are otherwise marketed online, Action Care objects to Interrogatory No. 9 on the grounds that such claims or counterclaims are in the public record and would be available to MFB. However, in the spirit of cooperation, Action Care answers as follows:

Action Care is aware of at least the following third-party registrations that incorporate the words "PROOF" or "PROVE" in relation to chemical preparations, in-vitro testing products, and related products.

11

- SO ACCURATE WE CALL IT THE ERROR PROOF TEST
  https://tsdr.uspto.gov/#caseNumber=85685061&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch
- VETPROOF
  https://tsdr.uspto.gov/#caseNumber=79201702&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch
- FOODPROOF
  https://tsdr.uspto.gov/#caseNumber=75712179&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch
- PATHOPROOF
  https://tsdr.uspto.gov/#caseNumber=79080841&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch
- GENEPROOF
  https://tsdr.uspto.gov/#caseNumber=79260309&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch
- PURE. PROVEN. PERFECT.
  https://tsdr.uspto.gov/#caseNumber=85806356&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch
- IPROVEN
  https://tsdr.uspto.gov/#caseNumber=88725805&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch
- PROVERA
  https://tsdr.uspto.gov/#caseNumber=78301939&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch
- PROVENT
  https://tsdr.uspto.gov/#caseNumber=85307785&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch

Action Care is aware of its continuing duty to supplement responses under Rule 26(e).

**INTERROGATORY NO. 10:**

For each affirmative defense asserted in your Answer regarding the trademark claim, state the factual basis for the defense.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the generality of the General Objections, Action Care objects to Interrogatory No. 10 to the extent that it is not proportional to the needs of the case, requiring extensive investigation and analysis

beyond the current stage of discovery. Action Care further objects to the extent that the Interrogatory seeks information that calls for legal conclusions or interpretations. Action Care further objects to the extent that the Interrogatory seeks information protected by the attorney-client privilege or work product doctrine. Action Care also objects to Interrogatory No. 10 on the grounds that it is overly broad and unduly burdensome, as it seeks detailed factual bases for each affirmative defense without limitation. However, in the spirit of cooperation, Action Care answers as follows:

1st affirmative defense: Action Care asserts that MFB's allegations do not meet the legal standards for trademark infringement. Specifically, MFB has failed to adequately allege the elements necessary to establish a claim under the Lanham Act, including but not limited to the likelihood of confusion between the OVUPROOF and PROOV marks. MFB's complaint lacks sufficient factual detail to support its claims of trademark infringement.

4th affirmative defense: Actual damages for trademark infringement have to be proven with sufficient particularity. While a plaintiff may engage in some speculation in calculating hypothetical impacts, such speculation cannot be "undue speculation."

5th affirmative defense: Under 15 U.S.C. § 1117(a), only profits attributable to the trademark infringement may be appropriately awarded for trademark infringement. To the extent that Action Care can prove that certain portions of Action Care's profits were not attributable to the alleged infringement of MFB's trademark rights, such portion of profits would be inappropriate to include as part of the award.

6th affirmative defense: Under 15 U.S.C. § 1117(a), a plaintiff's actual damages and a defendant's profits are two distinct aspects that may be awarded in the action. To the extent

that the same funds are counted as part of both categories, that would be inappropriate and would inappropriately inflate such damages.

8th affirmative defense: Any alleged infringement by Action Care was unintentional and based on a good faith belief in the legality of its actions. Action Care's intent was to lawfully enter the market with a distinct product offering.

13th affirmative defense: Action Care's use of the word "PROOF" as part of the OVUPROOF mark is protected by the First Amendment by virtue of needing the term to adequately convey to consumers the products being provided.

14th affirmative defense: MFB used a meritless copyright infringement claim in an anticompetitive manner.

15th affirmative defense: MFB has engaged in conduct that constitutes misuse of trademark rights, including the submission of willful false statements to the United States Patent and Trademark Office to maintain its trademark registration. MFB's actions in enforcing its trademark rights have been anticompetitive and in bad faith, warranting the application of the unclean hands doctrine.

16th affirmative defense: To the extent that MFB can actually satisfy the elements of trademark infringement – namely, ownership of a valid trademark and that there is a likelihood of confusion between the parties' marks – MFB is unlikely to prove that it incurred any actual damages from Action Care's use of the OVUPROOF trademark.

17th affirmative defense: The PROOV mark is a phonetic equivalent of a term that is generic for MFB's products and is therefore incapable of serving as a source identifier. The term "PROOV" is a misspelling of "PROOF" or "PROVE," which are commonly used in

the context of chemical preparations and tests, particularly in the fertility testing industry. As such, the mark does not qualify for trademark protection under the Lanham Act.

18th affirmative defense: If for whatever reason the PROOV mark is found not to be generic, then at best it is descriptive of MFB's products. In that case, the mark would be incapable of being protected under the Lanham Act unless the mark had acquired secondary meaning for consumers to serve as a source identifier. Action Care argues that MFB's PROOV mark has not acquired secondary meaning.

19th affirmative defense: The OVUPROOF and PROOV marks differ significantly in appearance, sound, and meaning. The OVUPROOF mark includes the prefix "OVU," which is distinct from the "PROOV" mark. Additionally, the overall impression of the marks, including their phonetic and visual differences, negates any likelihood of consumer confusion. Action Care's marketing and branding strategies further differentiate its products from those of MFB.

20th affirmative defense: MFB submitted at least one willful false statement when, as part of MFB's efforts to maintain MFB's federal registration for the PROOV mark, MFB submitted a statement during the pendency of this litigation that there was no pending claim concerning MFB's rights in the PROOV mark. That statement was, objectively speaking, false. Such fraud merits cancellation of the federal registration and, given that that registration is the basis of MFB's trademark infringement claim, cancellation of the registration would serve as a defense to the trademark infringement claim.

Action Care is aware of its continuing duty to supplement responses under Rule 26(e).

15

**INTERROGATORY NO. 11:**

State the factual basis for the statement in Para. 24 of your proposed First Amended Complaint: "*that the delisting of Action Care's products caused by MFB's DMCA Takedown Notice prevented Action Care from being able to sell the SEB Strips through Action Care's developed trade channels.*"

**ACTION CARE'S RESPONSE***:* Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 11 as overly broad and unduly burdensome, seeking detailed factual bases without reasonable limitation. Action Care also objects on the grounds that the Interrogatory is not proportional to the needs of the case, requiring extensive investigation beyond the current stage of discovery. Action Care further objects to the extent that the interrogatory seeks information that is publicly available or already known to MFB. However, in the spirit of cooperation, Action Care answers as follows:

At the time that Action Care's Amazon listing was removed due to MFB's takedown notification, Amazon had been the only trade channel that Action Care had developed in any meaningful kind of way. Action Care had invested time and money specifically into optimizing the potential of sales through Action Care's Amazon listing. While Action Care did have its website set up through Shopify, this trade channel had not been significantly developed, and as it became clearer that MFB intended to continue keeping Action Care out of the marketplace through allegations of copyright infringement, Action Care determined that it was not worth making significant investments into developing other online trade channels if all MFB would have to do to keep Action Care out of the marketplace was submit a meritless DMCA takedown notification. To iterate, Amazon had been the sole developed trade channel for Action Care to sell its SEB Strips, and MFB's takedown notification removed that capability.

16

**INTERROGATORY NO. 12:**

State the factual basis for the statement in Para. 24 of your proposed First Amended Complaint that: "*As a direct and proximate result of MFB's actions, Action Care has been injured substantially and irreparably. Such injury includes, but is not limited to, the financial and personal expenses associated with responding to the takedown notice, reputational damage resulting from a lower seller rating and lower account health, and lost revenues from an inability to sell Action Care's products through Amazon.*"

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the generality of the General Objections, Action Care objects to Interrogatory No. 12 on the grounds that Paragraph 24 of the First Amended Complaint does not contain the statement alleged in the Interrogatory. However, Action Care believes in good faith that Action Care's responses to other Interrogatories will sufficiently address the information requested through Interrogatory No. 12.

**INTERROGATORY NO. 13:**

State the factual basis for the statement in Para. 39 of your proposed First Amended Complaint that: "*Action Care had a reasonable expectation of entering into a valid business relationship with more consumers who would have purchased Action Care's products through the Action Care Amazon Product Listing Page.*"

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 13 to the extent it seeks information that is overly broad, unduly burdensome, or not proportional to the needs of the case. Action Care further objects to the extent the interrogatory seeks information that is publicly available or already known to MFB. However, Action Care answers as follows:

In the roughly three-week period of Action Care's ability to sell its products via Amazon, it sold 242 boxes of its products to consumers on Amazon. Many of these customers (there was a total of 230 orders, so some customers bought more than one box) would have been

17

likely to return for future purchases (though the potential effectiveness of the products – i.e., customers' getting pregnant based on an ability to test accurately as to ovulation) may have naturally resulted in some customers not purchasing more products due to mootness. Action Care's OVUPROOF products also had generally good reviews, meaning that a significant number of other Amazon consumers seeking ovulation test strips that tested for PdG and that did not require the purchase of an additional device to effectively operate the test strips were likely to have purchased Action Care's products if not for interference by MFB.

As an example, in early August 2023, Amazon temporarily reinstated Action Care's product listing. To recollection of Diane Krasznay, Action Care's principal, during the brief roughly two-day period during which Action Care's Amazon listing was reinstated in August 2023, one or two boxes were ordered and fulfilled using the couple of boxes that Amazon still had in its possession after Amazon initially sent back all inventory to Action Care. However, during this brief period, Amazon did not have any other inventory of Action Care's products because the existing stock had been either shipped back or lost. There was not enough time to supply new inventory to Amazon to fulfill such new sales. This situation arose because the inventory was returned to Action Care following a previous deactivation of the listing by Amazon after MFB's interference.

Action Care incurred financial losses when it shipped new inventory (consisting of 450 new boxes) to Amazon, which was subsequently destroyed after the listing was removed yet again. The decision was made not to have the 450 new boxes shipped back due to the high costs associated with such returns. This decision followed a previous return of 170 boxes, the shipping for which cost over $1,000. Having the 450 boxes returned to Action Care would have cost many times over the expenditures associated with return of the initial stock.

Ms. Krasznay made continued efforts to have Amazon reinstate the listing, including requests for postponement of the inventory return date. Unfortunately, these requests were denied by Amazon, further complicating Action Care's ability to maintain a valid business relationship with consumers through the Amazon platform.

Action Care relied heavily on Amazon for customer acquisition due to Action Care's limited advertising budget, which restricted Action Care's ability to engage in large-scale advertising efforts. This reliance on Amazon was a critical component of Action Care's business strategy and its expectation of entering into a valid business relationship with more consumers.

While Action Care believes that expert discovery will be required to properly valuate the prospects of Action Care's business of which Action Care was deprived as a result of MFB's conduct (and information and documentation from MFB still has to be produced), Action Care notes that, according to the website JungleScout.com, MFB's sales of 5-count ovulation test strips measuring PdG on Amazon result in gross sales of around $45,000 per month, based on September 2025 figures. (Action Care notes that searches on JungleScout.com in prior months had shown MFB having gross revenues for sales of those types of products, ranging between $60,000 and $80,000 per month.) Meanwhile, according to the same website, another merchant that arrived in the marketplace many months after Action Care (Easy@Home) is selling 5-count ovulation test strips measuring PdG for over $90,000 per month in gross sales. Action Care believes that this class of customers within the market would have been likely to purchase Action Care's products as an alternative to MFB's products.

Action Care is aware of its continuing duty to supplement responses under Rule 26(e).

**INTERROGATORY NO. 14:**

State the factual basis for the statement in Para. 51 of your proposed First Amended Complaint that: "*MFB's false assertion of fact about Action Care's causing the copying of MFB's products prejudiced Action Care by imputing a lack of Action Care's ability in Action Care's trade, profession, or business, and/or Action Care's want of integrity in business.*"

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 14 to the extent it seeks information that is overly broad, unduly burdensome, or not proportional to the needs of the case. Action Care further objects to the extent the interrogatory seeks information that is publicly available or already known to MFB. In the spirit of cooperation, Action Care answers as follows:

MFB falsely stated to Amazon that Action Care "found a cheap Chinese manufacturer to copy [MFB's] tests." Accusing someone of seeking out a cheap foreign manufacturer to replicate a competitor's process, methodology, or product suggests that the purported copier doesn't have integrity within their business. It also suggests that the purported copier does not have ability in their trade, profession, or business to succeed without resorting to underhanded methods, because such purported copier would resort to stealing a competitor's process, methodology, or product.

**INTERROGATORY NO. 15:**

State the factual basis for the statement in Para. 66 of your proposed First Amended Complaint that: "*MFB is causing irreparable harm to Action Care for which there is no adequate remedy at law.*"

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 15 to the extent it seeks information that is

overly broad, unduly burdensome, or not proportional to the needs of the case. Action Care further objects to the extent the interrogatory seeks information that is publicly available or already known to MFB. Action Care further objects to Interrogatory No. 15 to the extent that it suggests that the harm suffered by Action Care based on MFB's continued registration of the PROOV mark must be irreparable (and that that is the sole type of harm Action Care alleges to have suffered) for cancellation proceedings to be appropriate. However, in the spirit of cooperation, Action Care answers as follows:

MFB's actions, which resulted in Action Care's inability to sell its OVUPROOF-brand products through Action Care's developed trade channels, resulted in a loss of market position and customer base. The public nature of the takedown and the allegations of infringement have caused reputational harm to Action Care, affecting its relationships with customers and business partners. While this has had a financial impact for which there may, in part, be a remedy at law, such remedy is inadequate. Monetary damages alone are insufficient to compensate for the ongoing harm to Action Care's business reputation and market presence, which are critical to Action Care's long-term success.

### INTERROGATORY NO. 16:

State the name, address, telephone number and email address the of the person(s) at Shanghai Eugene Biotech Co., Ltd. ("SEB") most knowledgeable about the business relationship between SEB and Defendant.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 16 to the extent that seeks personal information that may infringe on privacy rights or confidentiality agreements. Action Care

further objects on the grounds that the Interrogatory seeks information not relevant to any party's claim or defense. However, in the spirit of cooperation, Action Care answers as follows:

The name of SEB's representative with whom Action Care's principal, Diane Krasznay, communicated was named Eileen Wen. Ms. Krasznay does not believe that Ms. Wen is still employed with SEB. Ms. Wen's email at SEB was eileen@eugenebio.com. The company's phone number was 86-21-57526862. SEB's address at the time that Action Care communicated with SEB was Building 1, Runcai intelligent industrial park, no. 1666 Xinyang road, Fengxian district, Shanghai, China 201314.

**INTERROGATORY NO. 17:**

State the date Defendant made the decision to abandon the buyovuproof.com domain, who made it and why.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 17 to the extent that it suggests that Action Care's lack of use of the buyovuproof.com website in any way constitutes voluntary abandonment of Action Care's business or OVUPROOF trademark. However, in the spirit of cooperation, Action Care answers as follows:

Action Care's principal, Diane Krasznay, made the decision to abandon commercial development of the Shopify website at buyovuproof.com. The decision was made around January 2024. The reason for such abandonment was because Ms. Krasznay had seen how easy it was for someone like MFB to get a site taken down via a DMCA takedown notice. A launch of the website in a manner that would make the site an economically viable trade channel required significant additional investment in terms of development, maintenance, and promotion.

Ms. Krasznay chose not to spend the funds on maintaining the buyovuproof.com website, given the high likelihood that MFB could seemingly get the site taken down through the submission of a DMCA takedown notice without regard for whether any content on the site was actually in any manner infringing on MFB's rights.

**INTERROGATORY NO. 18:**

State the date Defendant made the decision to cease the sale of SEB Strips under the OVUPROOF name, who made it and why.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 18 to the extent that it suggests that Action Care has abandoned the OVUPROOF trademark. Action Care further objects to this Interrogatory to the extent that it is repetitive and seeks information provided in Action Care's responses elsewhere. However, in the spirit of cooperation, Action Care responds as follows:

To date, Action Care has not abandoned its OVUPROOF trademark. Action Care did, however, ultimately determine that it was not economically feasible to continue attempting to sell OVUPROOF-brand products online for the foreseeable future.

Diane Krasznay, principal of Action Care, made the decision to cease trying to sell the OVUPROOF-brand PdG strips for the foreseeable future after Action Care was unable to sell the strips through its developed trade channel – namely, through Amazon – after MFB's meritless DMCA takedown notification. Specifically, after the takedown notification, Action Care diligently sought to have Action Care's Amazon listing reinstated through extensive communications with Amazon, but such efforts ultimately did not yield any results for a total of thirteen months after MFB's initial submission of the takedown notification. During this time

(and specifically prior to the Court's April 22, 2024 ruling), Action Care also determined that, given how easy it was for MFB to remove Action Care from an online marketplace through a DMCA takedown notification, it was too risky to make significant investments into developing online trade channels as an alternative to Amazon.

Action Care regained control of its Amazon listing in mid-July 2024, after over a year of campaigning. By then, all of Action Care's previously purchased inventory had been lost or expired. Action Care also had lost its second mover advantage, its income potential, exclusivity rights to sell SEB Strips within the United States, and any opportunity to become a significant player in the space. By the time Action Care regained control of the listing, several other sellers of PdG strips were firmly established on the Amazon marketplace. At the time when Action Care had first begun selling its products, Action Care was, to Diane Krasznay's actual knowledge, the sole retailer of the at-home PdG strips that did not require the purchase of additional machinery other than MFB. After wasting so much time, energy, and money (as well as incurring legal expenses defending MFB's meritless claims), Action Care saw no practical alternative other than to move on to other ventures.

### INTERROGATORY NO. 19:

State the net profit Defendant would have realized had it been able to sell the 174 and 450 "stranded" or "lost" units of Action Care's products referenced in your proposed First Amended Complaint.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 19 to the extent that it suggests that Action Care is limited to seeking actual damages. Action Care answers as follows:

During Action Care's roughly three-week period of ability to sell the product through Amazon, Action Care had sold 240 boxes at a price point of $21.95, with most of the sales occurring in the final week right before the takedown notification. During that same period, the fee charged by Amazon ranged between $4.00 and $6.50 per box. The per-box price paid for by Action Care to SEB for those particular units was $7.50. Therefore, the specific 174 and 450 units in question would have likely been sold on similar terms.

The 174 and 450 units mentioned in the First Amended Complaint, however, were just the tip of the iceberg in terms of damages suffered by Action Care. Action Care ultimately lost the remainder of Action Care's initial unsold 1,000 boxes because Action Care's products had an expiration date on them, and after over a year of inability to sell through Action Care's developed trade channel, it became untenable to try to sell the remaining stock. An assessment of just the units explicitly mentioned in the First Amended Complaint does not account for any future sales on Amazon during the 13-month period during which Action Care's Amazon listing was unavailable to Action Care. Further, it does not account for any future sales (and likely rate of growth) that may have occurred during subsequent years based on momentum and brand recognition that Action Care would have inevitably gained if it had not been removed from the marketplace at the early stage that it was. Such future sales would have also likely had higher profit margins, because Action Care would have been able to secure units from SEB at a lower price point due to the volume that Action Care could have been able to purchase from SEB. With the benefit of Action Care's exclusive distribution deal with SEB, Action Care also likely could have served as a wholesaler for SEB Strips within the United States.

### INTERROGATORY NO. 20:

State the total revenues, expenses, and net profits (or losses) of Action Care from 2022 to the present, identifying the source of the data.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 20 to the extent it seeks information that is overly broad, unduly burdensome, or not proportional to the needs of the case. Action Care further objects to this Interrogatory to the extent that it suggests that Action Care's relief is limited to actual damages. However, in the spirit of cooperation, Action Care answers as follows:

Aside from Action Care's e-commerce business selling the at-home PdG ovulation test strips, Action Care was engaged at all relevant times in business as a mobile veterinary clinic. Action Care considers revenues and expenses generated through the mobile veterinary clinic vector of the business to be irrelevant for the calculation of any potential damages in this case. Action Care's operations with respect to the sale of the at-home PdG ovulation test strips began through incurring expenses relating to purchasing the products from SEB. Action Care also invested in promoting the product, including through Amazon's VINE program, which involved providing product for free to incentivize reviews.

Action Care had certain occasional costs that it incurred, such as packaging and GS1 (UPC barcodes), fees for setting up the brand content on the Amazon store, consulting with professionals, website design, shipping expenses, and tariffs.

**INTERROGATORY NO. 21:**

Identify the names and addresses of the customers you contend were lost due to Plaintiff's actions, stating the amount of business lost from each.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 21 to the extent it seeks information that is overly broad, unduly burdensome, or not proportional to the needs of the case. Action Care further objects to the extent the interrogatory seeks information that is publicly available or already known to MFB. However, in the spirit of cooperation, Action Care answers as follows:

Due to the nature of online sales through platforms like Amazon, Action Care does not have direct access to specific customer identities or detailed information about individual consumers who may have been lost due to MFB's actions. The platform's privacy policies limit the availability of such data. For example, even when a sale occurred, because fulfillment was handled by Amazon, the only data that Action Care received with respect to such purchasers was first names and locations. Many of those consumers would have been likely to repeat as customers.

Additionally, Action Care contends that the class of consumers affected includes individuals seeking in-home ovulation test strips, particularly those interested in tracking progesterone levels for fertility purposes and without being required to purchase an additional device (other than just the strips) to operate the tests. These consumers were likely to purchase Action Care's products through the Amazon marketplace.

MFB's tortious interference, including the issuance of a DMCA takedown notice, disrupted Action Care's ability to reach and maintain relationships with this class of consumers.

The removal of Action Care's product listing from Amazon significantly hindered its market presence and consumer access.

MFB's conduct in submitting the meritless DMCA takedown notification further interfered with Action Care's relationship with Amazon. While Action Care's tortious interference claim is styled as "tortious interference with prospective economic advantage," Action Care notes that the First Amended Complaint includes all necessary allegations to sustain a claim for tortious interference with contractual relations, as it relates to Action Care's relationship with Amazon.

**INTERROGATORY NO. 22:**

State the total amount of damages you claim was caused by the alleged wrongful conduct of Plaintiff.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 22 to the extent that it suggests that Action Care is limited to seeking actual damages. Furthermore, the Interrogatory seeks information that requires a detailed and comprehensive analysis, which is premature at this stage of the litigation. An appropriate calculation of damages involves complex issues that necessitate expert analysis and opinion, which Action Care intends to obtain in due course. However, in the spirit of cooperation, Action Care answers as follows:

Under 17 U.S.C. § 512(f), if liability is found, the violator "shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . as the result of the service provider relying upon such misrepresentation . . ." (Emphasis added.) "In drafting the statute, Congress did not limit damages to monetary loss or other forms of specific relief even

28

though such limitations are included in other sections of the DMCA." *Signal 23 Television v. Anthony*, No. 1:17-CV-01452-SDG, 2020 WL 11206863, *3 (N.D. Ga. Sept. 1, 2020) (citing *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1156 (9th Cir. 2016)). "As a result, the damages an alleged infringer may recover under § 512(f) from 'any person' are broader than monetary relief." *Lenz*, 815 F.3d at 1156. Because "any damages" is broadly construed, such damages have been interpreted as being calculated by taking into account many different impacts, including lost revenues, loss of following, loss of ability to advertise and grow its audience, and the value of the time and effort spent responding to issues stemming from a takedown. *See Signal 23 Television*, 2020 WL 11206863, at *3.

Thus, while Action Care provides information relating to specific numbers of sales and profits generated during Action Care's brief ability to sell its products using Amazon (which can subsequently serve as a source of projection of potential revenues and profits during the period of Action Care's inability to sell via Amazon), as well as the expenses incurred in procuring inventory that ultimately was spoiled as a result of the inability to sell via Amazon, a more appropriate calculation of damages suffered by Action Care would also account for Action Care's loss of consumer base, loss of second-mover advantage, loss of the right to be the exclusive distributor of SEB Strips within the United States, and the time and resources spent by Action Care in dealing with the repercussions of the meritless takedown.

Meanwhile, under the Sherman Act, the injured party "shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). The Sherman Act also may result in an award of "simple interest on actual damages" for the period starting on the initial service of the Sherman Act claim and lasting through the date of judgment.

**INTERROGATORY NO. 23:**

Identify all communications you had with Amazon regarding appeal or counternotices or requests for reinstatement following 1) the June 2, 2023; 2) the August 9, 2023 deactivations of your product listings and 3) after the Courts dismissal of Plaintiff's copyright claim on April 22, 2024.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. However, Action Care answers as follows:

After MFB's takedown notice was submitted on June 2, 2023, Action Care immediately submitted a counternotification. After MFB initiated litigation in the second half of June 2023, Action Care engaged counsel, after which Action Care continued communicating with Amazon – sometimes directly through Diane Krasznay, and other times through counsel. On July 27, 2023, Action Care's counsel emailed a letter to Amazon stating Action Care's position with respect to MFB's allegations and seeking reinstatement. During this time, Diane Krasznay also spent considerable time on the phone speaking with Amazon representatives in an attempt to have her listing reinstated.

On or around August 8-9, 2023, Amazon reinstated Action Care's Amazon listing, but the listing was removed again by August 9, 2023. After this, Action Care and its counsel continued communicating with various Amazon representatives via email relatively consistently through mid-October 2023.

Finally, Action Care and its counsel made multiple attempts to contact Amazon in May 2024, informing Action Care of the Court's dismissal of the copyright infringement claim (as well as of the survival of Action Care's counterclaims), but Amazon did not respond or react to such communications in any way. Action Care's counsel subsequently sent a letter to Amazon dated July 3, 2024 (and again attaching the Court's order from April 22, 2024), which Amazon

finally acknowledged on July 10, 2024. Action Care's listing was ultimately reinstated on Amazon around mid-July 2024.

### INTERROGATORY NO. 24:

State whether you provided Amazon with notice of the Court's April 22, 2024, dismissal of Plaintiff's copyright claim in support of reinstatement and if not, why not.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. However, Action Care answers as follows:

Yes, Action Care provided multiple notices of the Court's April 22, 2024, dismissal of MFB's copyright infringement claim in an attempt to reinstate Action Care's Amazon listing.

### INTERROGATORY NO. 25:

Identify all steps you took, if any, to mitigate the damages you allege was caused by Plaintiff.

**ACTION CARE'S RESPONSE**: Action Care hereby incorporates the General Objections stated above as if set forth in full herein. Specifically, and without limiting the foregoing, Action Care objects to Interrogatory No. 25 to the extent that it suggests that Action Care is limited to seeking actual damages, or that Action Care had any obligation to mitigate damages beyond exercising reasonable diligence and efforts to mitigate. However, in the spirit of cooperation, Action Care answers as follows:

After MFB submitted its DMCA takedown notification, Action Care submitted a counternotification in early June 2023. Subsequently, after MFB initiated the litigation, Action Care communicated with Amazon throughout the summer of 2023 before and after engaging counsel. Action Care's counsel sent a letter to Amazon dated July 27, 2023, explaining Action Care's position (which largely mirrored Action Care's subsequently filed motion to dismiss)

seeking reinstatement of Action Care's Amazon listing. Action Care assumes that the brief roughly two-day period of reinstatement of Action Care's Amazon listing in early August 2023 was a byproduct of such correspondence. After Amazon again removed Action Care's listing in August 2023, Action Care continued to contact and communicate with various Amazon representatives on a consistent basis between August and mid-October 2023. Without any meaningful movement from Amazon, the communications stalled, and Action Care understood that it needed to have a ruling dismissing MFB's copyright infringement claim to prompt any further action from Amazon.

After the Court's ruling dismissing MFB's copyright infringement claim, Action Care and its counsel contacted Amazon multiple times in May 2024, yet again seeking reinstatement of Action Care's Amazon listing. Amazon did not respond to or act on such attempts at communication. Action Care's counsel then proceeded to send a letter to Action Care's legal department on July 3, 2024, the receipt of which Amazon's legal department acknowledged via email on July 10, 2024, indicating that they would look into the matter. Soon thereafter, the block on Action Care's listing was lifted. The year-plus hiatus, however, had decimated Action Care's e-commerce operations to a point that it was not feasible to re-launch.

Action Care had fostered its relationship with SEB from late 2022 into 2023, with indications from SEB being that Action Care may be able to secure an exclusive distribution deal of SEB Strips within the United States. Action Care was ultimately able to secure such a deal in September 2023 – at the time still based on the premise that Action Care would be able to distribute the product through its developed trade channel in short order. Action Care also explored the potential of serving as a large-scale wholesaler within the United States of the SEB

Strips. Action Care had communications with various parties interested in sourcing the SEB Strips through Action Care, but ultimately, those deals did not materialize.

Because Action Care viewed any investment into other online trade channels to be an untenable economic proposition during the pendency of the litigation, Action Care refrained from engaging in further online sales. Furthermore, because of the uncertainty surrounding Action Care's practical ability to sell products online, Action Care sought to avoid a situation in which Action Care's inventory would be spoiled again through expiration. As a result, by late fall 2023, Action Care sought to mitigate damages by <u>not</u> purchasing additional products, so as to avoid a similar scenario in which Action Care was saddled with inventory that it would be unable to sell through Action Care's developed trade channels.

**[SPACE INTENTIONALLY LEFT BLANK]**

## SPECIFIC OBJECTIONS AND RESPONSES TO MFB'S REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that Plaintiff owns U.S. Trademark Registration No. 5,622,245 for the mark "PROOV."

**ACTION CARE'S RESPONSE**: Action Care admits that MFB is listed as the owner of U.S. Trademark Registration No. 5,622,245 for the standard character word mark "PROOV" in the USPTO's records. This request is otherwise denied.

### REQUEST FOR ADMISSION NO. 2:

Admit that you have used the term "OVUPROOF" in commerce in connection with ovulation or fertility-related testing products.

**ACTION CARE'S RESPONSE**: Admitted.

### REQUEST FOR ADMISSION NO. 3:

Admit that your "OVUPROOF" products were or are sold through the same or similar online retail platforms as Plaintiff's "PROOV" products.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as being vague and ambiguous. In the interests of cooperation, Action Care admits that, prior to June 2, 2023, Action Care marketed at-home ovulation test strips using the term "OVUPROOF" as a trademark on various online retail platforms, including on Amazon, where MFB also offered products using the "PROOV" trademark. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 4:**

Admit that your "OVUPROOF" products were or are marketed to the same type of consumer as Plaintiff's "PROOV" products.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as being vague and ambiguous. Action Care further objects to the extent that this Request for Admission appears to be directed to the acts of nonparties to this litigation for which Action Care cannot answer and/or to do so would constitute work product. In the interests of cooperation, Action Care admits that Action Care marketed Action Care's products using the "OVUPROOF" trademark to consumers who would be interested in acquiring affordable at-home ovulation tests that measure PdG and that did not require the purchase of any device other than just the test strips. Action Care further admits that MFB had (and continues to have) a line of products that are also at-home ovulation test strips that measure PdG and do not require the purchase of any device other than just the test strips, and that MFB used the term "PROOV" in association with such ovulation test strips. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 5:**

Admit that you were aware of Plaintiff's "PROOV" trademark before you began using "OVUPROOF."

**ACTION CARE'S RESPONSE**: Action Care admits that, prior to beginning using "OVUPROOF" in association with the marketing of Action Care's products, Action Care was aware of MFB, MFB's products, and that MFB used the term "PROOV" in association with the marketing of such products. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 6:**

Admit that you did not conduct any consumer surveys showing no likelihood of confusion between "OVUPROOF" and "PROOV."

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as being vague and ambiguous. Action Care further objects to the extent that this Request for Admission appears to be directed to the acts of nonparties to this litigation for which Action Care cannot answer and/or to do so would constitute work product. Action Care further objects to this Request for Admission because it calls for Action Care to make a legal conclusion. In the interests of cooperation, Action Care admits that, as of the date of this response, Action Care has not commissioned any formal survey of potential consumers of fertility products with a request to provide an opinion as to whether the "OVUPROOF" brand is in any way confusing for such potential consumers with the "PROOV" brand. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 7:**

Admit that you did not obtain a written trademark clearance opinion before using "OVUPROOF."

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as being vague and ambiguous. Action Care further objects to the extent that this Request for Admission appears to be directed to the acts of nonparties to this litigation for which Action Care cannot answer and/or to do so would constitute work product. In the interests of cooperation, Action Care admits that Action Care did not obtain a written trademark clearance opinion from a licensed attorney as part of Action Care's research into the potential of using "OVUPROOF" as a trademark for its own products. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 8:**

Admit that Plaintiff has not authorized your use of the "OVUPROOF" name or mark.

**ACTION CARE'S RESPONSE**: Action Care admits that MFB has not authorized Action Care's use of the "OVUPROOF" name or mark. Action Care denies that Action Care's use of the "OVUPROOF" name or mark is not otherwise authorized.

**REQUEST FOR ADMISSION NO. 9:**

Admit that your use of "OVUPROOF" incorporates the entirety of Plaintiff's "PROOV" mark.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as being vague and ambiguous. In the interests of cooperation, Action Care admits that the "OVUPROOF" and "PROOV" marks have some letters in common. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 10:**

Admit that you did not resume selling products under the "OVUPROOF" mark after April 22, 2024.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as being vague and ambiguous. In the interests of cooperation, Action Care admits that Action Care did not sell products through online platforms under the "OVUPROOF" mark after April 22, 2024. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 11:**

Admit that at no point in time after MFB's copyright claim was dismissed by the Court on April 22, 2024, did you ever file with Amazon an appeal, counternotice, or other request for reinstatement.

**ACTION CARE'S RESPONSE**: Action care denies this Request for Admission in its entirety.

**REQUEST FOR ADMISSION NO. 12:**

Admit that at no point in time after MFB's copyright claim was dismissed by the Court on April 22, 2024, were you prohibited from selling SEB Strips under the "OVUPROOF" name or mark on Amazon.

**ACTION CARE'S RESPONSE**: Action Care denies this Request for Admission in its entirety.

**REQUEST FOR ADMISSION NO. 13:**

Admit that at no point in time since you began selling SEB Strips under the "OVUPROOF" name or mark were you ever prohibited or restrained from selling this product through any non-Amazon marketplace or distribution channel.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as vague and ambiguous. In the interests of cooperation, Action Care admits that Action Care is unaware of any other DMCA takedown notifications that may have been submitted by MFB to non-Amazon marketplace platforms. This Request for Admission is otherwise denied.

**REQUEST FOR ADMISSION NO. 14:**

Admit that you voluntarily made the decision to discontinue selling SEB Strips under the "OVUPROOF" name or mark.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as vague and ambiguous. Action Care admits that, after Action Care finally regained control of Action Care's Amazon marketplace storefront more than a year after MFB initiated this litigation, Action Care assessed the marketplace and determined that it was no longer an economically sound proposition for Action Care to sell the SEB Strips online due to a variety of factors. This Request for Admission is otherwise denied.

**REQUEST FOR ADMISSION NO. 15:**

Admit that you voluntarily made the decision to not pursue alternative channels of sale of SEB Strips under the "OVUPROOF" name during the pendency of any Amazon Takedown.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as being vague and ambiguous. Action Care further objects to the extent that this Request for Admission appears to be directed to the acts of nonparties to this litigation for which Action Care cannot answer and/or to do so would constitute work product. In the interests of cooperation, Action Care admits that Action Care did not deem it to be an economically sound proposition to pursue the sale of OVUPROOF-branded SEB Strips on other online marketplace platforms during the pendency of this litigation, given that such pursuit would have required significant amounts of investment of money and time on Action Care's part before any potential alternate channels would have become economically viable, and that MFB's prior actions had indicated a propensity to interfere with such potential efforts. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 16:**

Admit that you voluntarily made the decision to abandon the buyovuproof.com domain name.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as vague and ambiguous. Action Care admits that Action Care did not deem it to be an economically sound proposition to pursue the sale of OVUPROOF-branded SEB Strips on through the buyovuproof.com website, which had been established through Shopify, given that such pursuit would have required significant amounts of investment of money and time on Action Care's part before such trade channel would have become economically viable, and that MFB's prior actions had indicated a propensity to interfere with such potential efforts. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 17:**

Admit that no customer has ever told you they stopped purchasing your products because of any conduct engaged in by Plaintiff.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as vague and ambiguous. In the interests of cooperation, Action Care admits that, as of the date of this response, Action Care has not been contacted by any customer who has stated that such customer stopped purchasing Action Care's products because of any conduct engaged in by MFB. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that you have no written communication from Amazon stating that you were permanently banned from selling products on its platform.

**ACTION CARE'S RESPONSE**: Action Care admits that it has not received any written communication from Amazon stating that Action Care was permanently banned from selling products on Amazon. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 19:**

Admit that any inventory of SEB Strips that was stranded, lost, or returned was under Amazon's control, not Plaintiff's.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as vague and ambiguous. In the interests of cooperation, Action Care admits that, to Action Care's knowledge, MFB did not have possession of the inventory of SEB Strips that were stranded, lost, or returned as a result of disruptions in Action Care's operations caused by MFB's meritless DMCA takedown notification submitted to Amazon against Action Care. This request is otherwise denied.

**REQUEST FOR ADMISSION NO. 20:**

Admit that you have not produced any documents supporting your contention that Plaintiff's actions caused your business to fail.

**ACTION CARE'S RESPONSE**: Action Care denies this Request for Admission in its entirety.

**REQUEST FOR ADMISSION NO. 21:**

Admit that you have no present intention to resume sales of SEB Strips under the "OVUPROOF" name or mark on Amazon or through any marketplace or distribution channel.

**ACTION CARE'S RESPONSE**: Action Care objects to this Request for Admission as vague and ambiguous. In the interests of cooperation, Action Care admits that Action Care has no immediate plans to resume sales of SEB Strips online as a result of various circumstances that affect the economic proposition and viability of any such potential efforts. This request is otherwise denied.


Dated: October 13, 2025


Respectfully submitted,

ACTION CARE MOBILE VETERINARY CLINIC, LLC

By: ___/s/ *Ilya G. Zlatkin*_____
Ilya G. Zlatkin (ARDC No. 6314344)
ZLATKIN CANN ENTERTAINMENT
4245 North Knox Avenue
Chicago, Illinois 60641
ilya@zce.law
Tel: (312) 809-8022
Fax: (312) 809-6918

*Attorney for Defendant/Counter-plaintiff*
*Action Care Mobile Veterinary Clinic, LLC*

## <u>VERIFICATION</u>

I, Diane Krasznay, verify that I have read the foregoing **Action Care's Responses and Objections to MFB's Interrogatories, Requests for Production of Documents, and Requests for Admission**, and that the answers contained therein are true and correct to the best of my information, knowledge, and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Dated: October 13, 2025

<u>/s/ *Diane Krasznay*</u>
Diane Krasznay
Sole Member and Sole Manager of Action Care Mobile Veterinary Clinic, LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that all counsel of record who have consented to electronic service are being served with a copy of the foregoing via electronic mail.

Dated: October 13, 2025

By: ___/s/ *Ilya G. Zlatkin*_____
Ilya G. Zlatkin
*Attorney for Defendant/Counter-plaintiff*
*Action Care Mobile Veterinary Clinic, LLC*