## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MFB FERTILITY INC., a Colorado Corporation, | ) |
| | ) |
| | ) Case No. 1:23-cv-03854 |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| | ) Honorable John J. Tharp, Jr. |
| v. | ) Magistrate Judge Gabriel A. Fuentes |
| | ) |
| ACTION CARE MOBILE VETERINARY | ) JURY DEMAND |
| CLINIC, LLC, a Maryland limited liability | ) |
| company, | ) |
| | ) |
| Defendant/Counter-Plaintiff. | ) |

**MFB'S RESPONSE IN OPPOSITION TO DEFENDANT'S
SECOND MOTION FOR COURT APPROVAL TO USE SKRIBE.AI FOR
DEPOSITIONS AND TO COMPEL DEPOSITION OF DR. AMY BECKLEY**

Plaintiff MFB Fertility Inc. ("MFB") respectfully submits this response to Defendant's Second Motion for Court Approval to Use Skribe.AI for Depositions.

**1. Preliminary Statement**

The Court denied Defendant's initial motion because Defendant failed to establish that its proposed procedure would comply with Rules 28 and 30 of the Federal Rules of Civil Procedure and would provide sufficient indicia of reliability for use as an official deposition record. Defendant has now submitted additional information concerning that issue which may or may not be sufficient for this Court. Even if it is, that determination is only Part 1 of the required analysis. Part 2 (acknowledged by Defendant) is the Court's admonition in its standing AI Policy that "[t]he use of AI by litigants, attorneys, judges, judicial clerks, research attorneys, and court staff providing similar support may be expected, should not be discouraged, and is authorized <u>provided it complies with legal and ethical standards</u>." (Emphasis added).

Defendant's Second Motion fails to address any of the legal and ethical concerns raised by the undersigned, and the Declaration of Thomas J. Irby (Skribe's Chief Executive Officer) submitted in support of that motion likewise does not address those concerns. Defendant's First Motion similarly failed to do so.[1]

### 2. The Nature of This Particular Product

Defendant attempts to minimize the role of artificial intelligence by stating that "[s]o-called 'generative AI' is not used to create the official deposition record." While literally true, that statement is misleading because it addresses an issue Plaintiff has never raised. Plaintiff has never contended that generative AI prepares the certified transcript. Rather, Plaintiff's concern is that Defendant proposes to use an AI platform that receives, processes, analyzes, and generates analytical outputs from confidential deposition testimony in real time for the purpose of assisting counsel during the examination.

Indeed, Defendant expressly acknowledges that Skribe "offers optional AI analytical tools that attorneys may use to review testimony" and that those features utilize Anthropic's enterprise API.

Skribe itself markets these capabilities as "AI-Powered Analysis," "Deposition Intelligence," and tools that help lawyers "analyze and act on testimony immediately."

---

[1] Defendant states at the end of its Second Motion that "*The Court did not identify any issues concerning artificial intelligence capabilities offered by Skribe*" – which is not the same as stating that that issue has been addressed or ruled on by this Court.

2

3





Thus, Defendant admits that deposition testimony is transmitted to a third-party large language model for substantive analysis during the deposition. Whether those AI features are characterized as "optional" or whether they form part of the official deposition record is beside the point. The concern is that confidential testimony and exhibits are being submitted to a third-party AI platform to generate analytical outputs intended to assist one party's attorney in examining the witness.

Likewise, Defendant's representation that customer data is not used to train AI models addresses only one aspect of Plaintiff's concerns. It does not explain what information is transmitted to the AI system; what prompts, instructions, analytical outputs, summaries, or recommendations are created; whether those materials are retained; what metadata is generated; whether such materials are discoverable; or how the use of a third-party AI platform impacts

4

attorney-client privilege, work-product protection, confidentiality obligations, and compliance with the Protective Order.

These are not hypothetical concerns. They are the same concerns identified by the American Bar Association in Formal Opinion 512, which instructs that lawyers must understand how a generative AI platform receives, stores, processes, retains, and protects confidential client information before using it in the representation of a client. Likewise, the Association of Corporate Counsel has cautioned that attorneys should not input confidential or privileged information into generative AI systems without first understanding the provider's data handling, security, confidentiality, and retention practices. Those concerns are amplified where, as here, the platform is designed not merely to record testimony, but to analyze testimony and assist counsel during an active deposition.

Skribe itself markets these capabilities as "AI-Powered Analysis," "Deposition Intelligence," and tools that enable attorneys to "analyze and act on testimony immediately." Those representations are fundamentally different from the role traditionally performed by a neutral court reporter. Rather than simply creating an official record, Skribe is marketed as an AI litigation platform that analyzes deposition testimony for the strategic benefit of one party during the examination.

Defendant's First Motion, Second Motion, and the Declaration of Skribe's Chief Executive Officer do not meaningfully address these legal and ethical concerns. Instead, they largely focus on assuring the Court that the AI does not generate the official transcript and that customer data is not used to train AI models - neither of which addresses Plaintiff's central objection to the use of a third-party large language model to receive and analyze confidential deposition testimony in real time.

Defendant's First and Second Motion and the Declaration of Skribe's CEO provide no meaningful explanation of how these legal and ethical concerns are addressed.

### 3. Relevant Context and The Undersigned Obligations to Its Client

As General Counsel to Levenfeld Pearlstein (a 125 attorney business law firm) and one of four people on the firm's AI Policy Task Force (the other three being the firm's CTO, a data privacy partner and a knowledge management specialist), the undersigned is uniquely positioned to articulate a focus on confidentiality, protective-order compliance, data retention, artificial intelligence processing of testimony, third-party access to deposition materials, and the creation of AI-generated derivative content.

In this capacity, the undersigned has, for example, created an *Acceptable AI Use Policy* which provides, in part:

#### A. Purpose and Scope of Policy

The Firm recognizes the increasing role of AI in legal practice and aims to establish clear guidelines to ensure its responsible and ethical use. To that end, the Firm established an AI Task Force, chaired by its General Counsel, which is responsible for reviewing and approving work-related use of AI and any products, tools, or software incorporating GenAI capabilities. This Policy is subject to change as the technology and its applications evolve.

#### 1. What is "Generative" AI and How It Differs From "Traditional" AI

Traditional AI is designed for specific tasks using predefined rules, data, or models. It follows set patterns and does not create new content.

Generative AI, in comparison, uses large machine learning models trained on massive datasets to generate new content based on user inputs. Instead of relying solely on existing sources, it can produce new text, images, videos, and other content. GenAI applications like ChatGPT, Gemini, Claude, Sora, and Apple Intelligence all generate original content. GenAI applications geared toward the legal industry, such as CoCounsel, also create original content based on inputs.

6

2. **Key Risks in Using GenAI in the Legal Profession**

While GenAI can increase efficiency and productivity, it can pose unique risks because it collects and utilizes information from unverified sources. Understanding these risks is essential for ensuring its proper use.

3. **Compliance with Ethical & Legal Standards**

- The use of GenAI may lead to breaches of ethical duties, including ABA Model Rule 1.6 (Confidentiality of Information) and State bar rules.
- Client contracts and outside counsel guidelines may prohibit GenAI usage.
- The Firm may unknowingly violate data privacy laws (such as GDPR and CCPA) if client data is processed or stored by a GenAI tool without appropriate safeguards.

4. **Accidental Disclosure of Confidential Information or Loss of Privilege**

- Client sensitive data could be stored, processed, or used to improve or "train" AI models, making it theoretically accessible to third parties.
- Many GenAI providers do not guarantee data confidentiality.
- Communications with public GenAI tools may be deemed non-privileged.

5. **Potential Liability Concerns**

- GenAI can produce citations and references that do not exist, leading to ethical and professional liability risks.
- GenAI content may be subject to copyright, defamation, or data privacy issues, resulting in legal liability.
- Courts may have specific rules about the disclosure and/or prohibition of GenAI use.
- GenAI can generate false, misleading, or nonsensical information that appears credible.

B. **Firm GenAI Policy**

To ensure that the Firm's use of GenAI complies with applicable legal and ethical rules and minimizes risk to the Firm and our clients, the following policy will apply to any use of GenAI by Firm personnel.

- **Firm Approved GenAI.** Firm personnel may only use Firm approved GenAI tools for work-related purposes. Currently, the Firm has approved the GenAI tools listed on LPConnect. Please check this list frequently as it is subject to change as new tools are approved for use. <u>These approved GenAI tools have been vetted to address confidentiality concerns and to ensure that</u>

<u>client information remains within the Firm and cannot be publicly accessed or used to train AI models.</u>

- **Personal AI Tools Prohibited**. LP prohibits using personal or non-Firm approved GenAI tools for any work-related tasks or activities, whether on a mobile phone, laptop, or other device. This includes any use of ChatGPT or other public-facing GenAI tools for any work purposes. Use of an LP email address as a login for any personal GenAI tools is also prohibited.

As such, the undersigned concern relate directly to its client obligations.

The principal concern is that when a lawyer inputs confidential client information into a public or third-party LLM, the lawyer may be disclosing information to a third party outside the attorney-client relationship. If the AI provider retains, reviews, uses, or trains on the data, that disclosure can create arguments that confidentiality has been compromised and, in some circumstances, that attorney-client privilege has been waived. The ABA's Formal Opinion 512 emphasizes that lawyers must understand how a generative AI tool handles client information before using it and may need informed client consent before entering confidential information into the system. The ABA specifically cautions that lawyers remain responsible for protecting client confidences and supervising the use of AI tools.

Defendant seeks approval not simply for a non-stenographic recording method, but for use of an AI-powered platform that analyzes and creates additional content derived from deposition testimony. The existence of a digital reporter does not answer the separate questions raised by the platform's AI functionality and its handling of confidential information.

Accordingly, Plaintiff respectfully requests that the Motion be denied.

8

Dated: June 29, 2026

**MFB Fertility Inc., a Colorado Corporation**

By: _/s/ Gary I. Blackman_
    One of Its Attorneys

Gary I. Blackman (ARDC # 6187914)
Levenfeld Pearlstein, LLC
120 S. Riverside Plaza, Suite 1800
Chicago, Illinois 60606
(312) 346-8380
(312) 346-8434 (Fax)
gblackman@lplegal.com

      and

Patrick R. Moran (ARDC # 6272747)
Rock Fusco & Connelly, LLC
333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
pmoran@rfclaw.com

***Attorneys for Plaintiff/Counter-Defendant
MFB Fertility Inc.***

9

## CERTIFICATE OF SERVICE

I, Gary I. Blackman, an attorney, hereby certify that on June 29, 2026, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF filing system, which will send notification of such filing to all attorneys of record.


/s/ Gary I. Blackman