**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MFB FERTILITY INC., a Colorado Corporation,<br><br>Plaintiff/Counter-Defendant,<br><br>v.<br><br>ACTION CARE MOBILE VETERINARY CLINIC, LLC, a Maryland limited liability company,<br><br>Defendant/Counter-Plaintiff. | ) | Case No. 1:23-cv-03854<br><br>Honorable John J. Tharp, Jr.<br>Magistrate Judge Gabriel A. Fuentes<br><br>JURY DEMAND |

**PLAINTIFF MFB FERTILITY INC.'S**
**REPLY TO THE AMICUS BRIEFING**

Plaintiff/Counter-Defendant MFB Fertility Inc. ("MFB") respectfully submits this reply to the amicus briefing solicited by the Court [Dkt. 106].

MFB writes for a limited purpose: to remind the Court of the specific objection MFB actually raised, and to note that the amicus briefing neither addresses nor resolves that objection.

**1. MFB's Objection Has Always Been Directed at Skribe's AI Analytical Features - Not at Whether a Deposition May Be Recorded Non-stenographically.**

As MFB explained in its Response [Dkt. 108], the Court's inquiry has two parts. Part 1 asks whether Action Care's proposed procedure complies with Rules 28 and 30 of the Federal Rules of Civil Procedure and provides sufficient indicia of reliability for use as an official deposition record. Part 2 is the Court's admonition in its standing AI Policy that the use of AI "may be expected, should not be discouraged, and is authorized *provided it complies with legal and ethical standards*." MFB's objection has always been directed at Part 2. MFB does not contend that the Federal Rules prohibit non-stenographic depositions.

As set forth more specifically in its briefs, MFB's concern is different and specific. Skribe markets itself as an AI-powered "Deposition Intelligence" platform offering "AI-Powered Analysis" and tools that let litigators "analyze and act on testimony immediately." As Action Care concedes, Skribe "*offers optional AI analytical tools that attorneys may use to review testimony*," and those features utilize Anthropic's enterprise API. In other words, confidential deposition testimony and exhibits are transmitted to a third-party large language model for substantive analysis, in real time, for the strategic benefit of one party during the examination. That is fundamentally different from the neutral role traditionally performed by a court reporter, and it is the feature to which MFB has objected from the outset.

**2. Action Care's Assurances Do Not Answer the Concern MFB Raised.**

Action Care's submissions largely repeat two assurances - that generative AI does not create the official transcript, and that customer data is not used to train AI models. Neither addresses MFB's objection. That generative AI does not prepare the certified transcript responds to a point MFB never raised. And the representation that data is not used for AI training addresses only one aspect of MFB's concern. It does not explain what information is transmitted to the AI system; what prompts, instructions, analytical outputs, summaries, or recommendations are created; whether those materials are retained; what metadata is generated; whether such materials are discoverable; or how the use of a third-party AI platform affects attorney-client privilege, work-product protection, confidentiality obligations, and compliance with the Protective Order entered in this action.

These are not hypothetical concerns. They are the concerns identified by the American Bar Association in Formal Opinion 512, which instructs that lawyers must understand how a generative AI platform receives, stores, processes, retains, and protects confidential client information before using it, and that informed client consent may be required. The Association of Corporate Counsel

has cautioned to the same effect. Those concerns are amplified where, as here, the platform is designed not merely to record testimony <u>but to analyze it and assist counsel in real time (what to ask, what not to ask, etc.) during an active deposition</u>.

Lawyers in the US are cautioning clients about using AI chatbots for legal matters. Recent court rulings indicate that information shared with AI like Claude and ChatGPT may not be protected by attorney-client privilege. See, *Economic Times*, September 1, 2026, and *United States v. Heppner*, 820 F. Supp. 3d 292 (S.D.N.Y. 2026), attached as *Group Ex A*.[1]

The existence of a digital reporter does not answer these separate questions raised by the platform's AI functionality and its handling of confidential information.

**3. The Amicus Briefing Addresses a Question MFB Did Not Raise.**

The three sets of amici devote their submissions to whether the Federal Rules permit a deposition to be taken before a qualified notary and recorded by non-stenographic means, and to the professional qualifications of digital reporters. Those are useful contributions, but they answer a question MFB has not contested.

**4. MFB's Central Objection Remains Unaddressed and Unresolved.**

Action Care has represented that "the Court did not identify any issues concerning artificial intelligence capabilities offered by Skribe." As MFB has previously noted, that is different from saying the issue has been addressed or ruled upon by this Court. It has not been. Because the amicus briefing has now shifted the focus to the permissibility of non-stenographic recording, the record risks conflating two distinct questions.

[1] Because the duty of confidentiality under Rule 1.6 and ABA Formal Opinion 512 reaches all information relating to the representation - not only privileged material - the fact remains that testimony taken in a deposition does not, by itself, permit its onward transmission to a commercial AI platform and its third-party vendors.

The first (before whom, and by what recording method, a deposition may proceed) is not in controversy. The second (whether confidential testimony and exhibits may be fed to a third-party AI platform to generate analytical work product during the deposition, consistent with counsel's confidentiality, privilege, and Protective Order obligations) is the question MFB raised and that remains open.

MFB respectfully requests that the Court revisit and consider anew the specific objections MFB set out in its Response in Opposition to the Second Motion [Dkt. 108]. Because the intervening amicus briefing was directed to a different question, MFB is concerned that its original, more particularized concerns regarding confidentiality, attorney-client privilege, work-product protection, data retention, and compliance with the Protective Order in connection with Skribe's optional AI analytical features may not receive the Court's focused attention.

MFB does not seek to reargue those points here but respectfully asks that the Court review them once more as it takes up the Second Motion, so that the AI-features issue is squarely considered on its merits before any deposition proceeds using the Skribe platform.

**5. This Dispute Can Be Resolved By Action Care's Agreement Not to Use Skribe's Optional AI-Powered Analysis Features.**

This dispute could be resolved promptly and without further burden on the Court. The AI analytical tools at the heart of MFB's objection are, by Action Care's own description and by Skribe's own marketing, entirely "optional." They are not necessary to take the deposition, they are not necessary to create the certified record, and they are not necessary to any method the amici have endorsed. As a result, Action Care's counsel could resolve MFB's objection in its entirety by simply agreeing not to use Skribe's "AI-Powered Analysis" and "Deposition Intelligence" features, or any comparable real-time AI analytical functionality, in connection with the depositions in this matter.

Such an agreement would give Action Care everything it has said it seeks. Action Care would remain free to proceed with a non-stenographic deposition before a qualified, commissioned digital reporter and to obtain a reliable audiovisual record and certified transcript at the reduced cost it emphasizes. At the same time, that agreement would eliminate the confidentiality, attorney-client privilege, work-product, data-retention, and Protective Order concerns that constitute MFB's sole remaining objection, because confidential testimony and exhibits would no longer be transmitted to a third-party large language model for substantive analysis during the examination.

In short, the narrow feature MFB has objected to is the one feature Action Care does not need (but simply wants).

Dated: August 31, 2026

**MFB Fertility Inc., a Colorado Corporation**

By: *\/s/ Gary I. Blackman*
One of Its Attorneys

Gary I. Blackman (ARDC # 6187914)
Levenfeld Pearlstein, LLC
120 S. Riverside Plaza, Suite 1800
Chicago, Illinois 60606
(312) 346-8380
(312) 346-8434 (fax)
gblackman@lplegal.com

and

Patrick R. Moran (ARDC # 6272747)
Rock Fusco & Connelly, LLC
333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
pmoran@rfclaw.com

***Attorneys for Plaintiff/Counter-Defendant MFB Fertility Inc.***

## CERTIFICATE OF SERVICE

I, Gary I. Blackman, an attorney, hereby certify that on August 31, 2026, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF filing system, which will send notification of such filing to all attorneys of record.

*/s/ Gary I. Blackman*

**1:23-cv-03854 Notice has been electronically mailed to:**

Agelo L Reppas areppas@batescarey.com

Bradley Carl Williams bwilliams@batescarey.com

Bryan Paul Sugar Bryan.Sugar@lewisbrisbois.com, mary.dickinson@lewisbrisbois.com

Christian McGuire cmcguire@mbssmartlaw.com

Gary Irwin Blackman gblackman@lplegal.com, druiz@lplegal.com, ikropiewnicka@lplegal.com, kpatton@lplegal.com, nbailey@lplegal.com

Ian Howard Fisher ifisher@taftlaw.com, CHI_Docket_Assist@taftlaw.com, ksobun@taftlaw.com

Ilya Zlatkin ilya@zce.law, 8940587420@filings.docketbird.com, clerk@zce.law, zce@recap.email

Jonathan B. Amarilio jamarilio@taftlaw.com, chi_docket_assist@taftlaw.com, pbraun@taftlaw.com

Michelle Stratton mstratton@mbssmartlaw.com

Patrick R Moran pmoran@rfclaw.com, khutson@rfclaw.com, lwhite@rfclaw.com, slavelli@rfclaw.com

# GROUP EXHIBIT A

THE ECONOMIC TIMES | tech

English Edition ▾ | 01 September, 2026, 01:59 AM IST | **Today's ePaper**

# AI ruling prompts warnings from US lawyers: Your chats could be used against you

Reuters Last Updated: Apr 15, 2026, 03:40:00 PM IST

**Synopsis**
Lawyers in the US are cautioning clients about using AI chatbots for legal matters. Recent court rulings indicate that conversations with AI like Claude and ChatGPT may not be protected by attorney-client privilege. This means sensitive case details shared with AI could be revealed to prosecutors or opposing parties in legal disputes.



Reuters

As people increasingly turn to artificial intelligence for advice, some U.S. lawyers are telling their clients not to treat AI chatbots like trusted confidants when their freedom or legal liability is on the line.

These warnings became more urgent after a federal judge in New York ruled this year that the former CEO of a bankrupt financial services company could not shield his AI chats from prosecutors pursuing securities fraud charges against him.

In the wake of the ruling, attorneys have been advising that conversations with chatbots like Anthropic's **Claude** and **OpenAI**'s ChatGPT could be demanded by prosecutors in criminal cases or by litigation adversaries in civil cases.

"We are telling our clients: You should proceed with caution here," said Alexandria Gutierrez Swette, a lawyer at New York-based law firm Kobre & Kim.

People's discussions with their lawyers are almost always deemed confidential under U.S. law. But AI chatbots are not lawyers, and attorneys are instructing clients to take steps that could keep their communications with AI tools more private.

In emails to clients and advisories posted on their websites, more than a dozen major U.S. law firms have outlined advice for people and companies to decrease the chances of AI chats winding up in court.

Similar warnings are also appearing in hiring agreements by some firms with their clients. For instance, New York-based firm Sher Tremonte stated in a recent client contract that sharing a lawyer's advice or communications with a chatbot could erase the legal protection known as attorney-client privilege that usually shields communications between lawyers and their clients.

**A judicial ruling**

The case that helped set off the alarm bells involved Bradley Heppner, the former chair of bankrupt financial services company **GWG Holdings** and founder of alternative asset firm Beneficent. **Heppner** was charged by federal prosecutors last November with securities and wire fraud, and pleaded not guilty.

Heppner had used Anthropic's chatbot Claude to prepare reports about his case to share with his attorneys, who later argued that his AI exchanges should be withheld because they contained details from the lawyers related to his defense.

Prosecutors argued that they had a right to demand material that Heppner created with Claude because his defense lawyers were not directly involved, and because attorney-client privilege does not apply to chatbots.

Voluntarily revealing information from a lawyer to any third party can jeopardize the customary legal protections for those attorney communications.

Manhattan-based U.S. District Judge Jed Rakoff ruled in February that Heppner must hand over 31 documents generated by Anthropic's chatbot Claude related to the case.

No attorney-client relationship exists "or could exist, between an AI user and a platform such as Claude," Rakoff wrote.

Lawyers for Heppner did not immediately respond to requests for comment. A spokesperson for the U.S. attorney's office in Manhattan declined to comment.

Courts already are grappling with the growing use of artificial intelligence by lawyers and people representing themselves in legal cases, which among other things has led to legal filings containing made-up cases invented by AI.

Rakoff's decision was an important early test in the AI chatbot era for bedrock legal protections governing attorney-client communications and materials prepared for litigation.

On the same day as Rakoff's ruling, U.S. Magistrate Judge Anthony Patti in Michigan said a woman representing herself in a lawsuit she brought against her former company did not have to hand over her chats with OpenAI's ChatGPT about the employment claims made in the case.

Patti treated the woman's AI chats as part of her own personal "work-product" for the case, rather than as conversations with a person who her employer could seek to use for its defense.

ChatGPT and other generative AI programs "are tools, not persons," Patti wrote in his order.

The privacy and usage terms for both OpenAI and Anthropic state that the companies can share data involving their users with third parties. Both also state that they require users to consult a qualified professional before relying on their chatbots for legal advice.

Rakoff at a February hearing in Heppner's case noted that Claude "expressly provided that users have no expectation of privacy in their inputs."

Representatives for OpenAI and Anthropic did not immediately respond to requests for comment.

**Lawyers race to set guardrails**

The advice from lawyers has ranged from telling clients to select their AI platforms carefully to suggesting specific language to use in chatbot prompts.

Los Angeles-based O'Melveny & Myers and other firms said in client advisories that "closed" AI systems designed for corporate use could provide stronger protections for legal communications, though they said even that remains largely untested.

Some firms said AI legal research is more likely to be protected by attorney-client privilege when it is conducted at the direction of a lawyer. If a lawyer does advise the use of AI, a person should say so in the chatbot prompt, New York-headquartered law firm Debevoise & Plimpton said in a notice on its website.

"I am doing this research at the direction of counsel for [X] litigation," the firm suggested people write.

Information about AI use is also becoming common in contracts used by law firms with clients, according to a Reuters

review of contracts posted to a U.S. government website.

Sher Tremonte, which often represents white-collar criminal defendants, said in a new contract in March: "Disclosure of privileged communications to a third-party AI platform may constitute a waiver of the attorney-client privilege."

**Justin Ellis** of New York-headquartered law firm **MoloLamken** and other lawyers said they expect that more rulings will eventually clarify when AI chats can be used as evidence.

Until then, attorneys are saying that an age-old assumption still applies: Do not talk to anyone except your lawyer about your case - including AI.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA,<br><br>-v-<br><br>BRADLEY HEPPNER,<br><br>Defendant. |

25 Cr. 503 (JSR)

MEMORANDUM

JED S. RAKOFF, U.S.D.J.:

At a pretrial conference in this matter held on February 10, 2026, the Court, after hearing the arguments of counsel, granted from the bench the Government's motion for a ruling that certain written exchanges that defendant Bradley Heppner had with a generative artificial intelligence ("AI") platform were not protected from Government inspection by either the attorney-client privilege or the work product doctrine. See ECF No. 22 ("Gov't Mot."). This Memorandum sets forth the reasons for the Court's ruling.

## I. Background and Procedural History

Generative artificial intelligence tools have become increasingly prevalent across various domains of human activity. It has reliably been estimated, for instance, that more than half of United States households have adopted AI in some form. See Bond, Trends – Artificial Intelligence (2025), https://www.bondcap.com/report/pdf/Trends_Artificial_Intelligence.pdf at 59 (accessed February 12, 2026). Only three years after its release, one prominent AI platform is being used by more than 800 million people worldwide every week. Id. at 55. Yet the implications of AI for the law are only beginning to be explored.

Thus, the Court's ruling in this case appears to answer a question of first impression nationwide: whether, when a user communicates with a publicly available AI platform in connection with a pending criminal investigation, are the AI user's communications protected by attorney-client privilege or the work product doctrine?[1] For the reasons that follow, the answer is no.

On October 28, 2025, a grand jury in this District returned an indictment charging Heppner with securities fraud, wire fraud, conspiracy to commit securities fraud and wire fraud, making false statements to auditors, and falsifying corporate records. ECF No. 3. The indictment was unsealed on November 4, 2025, see ECF No. 4, and Heppner was arrested the following day in the Northern District of Texas. On November 10, 2025, Heppner pleaded not guilty before this Court to all the charges against him and was released on bond. See ECF Nos. 16, 18. Trial is set to commence April 6, 2026. See ECF No. 16.

The charges against Heppner arise from his alleged misconduct as an executive of several corporate entities, including the publicly traded company GWG Holdings, Inc. ("GWG"). See generally ECF No. 3. At a high level, the indictment charges that Heppner defrauded GWG's investors out of more than $150 million by making false representations about, and causing GWG to enter into undisclosed self-serving

[1] The Court is unaware of, and the parties have not identified, any case to date that has presented this issue. Most published decisions involving generative artificial intelligence have had to do with attorneys' misuse of that technology. That set of concerns is plainly not present here.

transactions concerning, two privately held companies that Heppner controlled, Beneficient Company Group, L.P. and Highland Consolidated L.P. See id. ¶¶ 1-3.

In connection with Heppner's arrest on November 4, 2025, agents with the Federal Bureau of Investigation executed a search warrant at Heppner's home and seized numerous documents and electronic devices. See Gov't Mot. at 3; ECF No. 23-1 at 1. Heppner's counsel later represented to the Government that among the seized materials were approximately thirty-one documents that memorialize communications that Heppner had with the generative AI platform "Claude," which is operated by the private company Anthropic. See Gov't Mot. at 3; ECF Nos. 23-1 23-2. According to Heppner's counsel, the documents represent communications between Heppner and Claude that took place "in 2025, after Mr. Heppner had received a grand jury subpoena [and] after it was clear with discussions with the government that Mr. Heppner was the target of this investigation." Transcript, February 10, 2026 ("Tr.") at 4. Without any suggestion from counsel that he do so, Heppner "prepared reports that outlined defense strategy, that outlined what he might argue with respect to the facts and the law that we anticipated that the government might be charging." Id. Thus, counsel asserted, Heppner "was preparing these reports in anticipation of a potential indictment." Id.

In exchanges with the Government, Heppner, through his counsel, asserted privilege over these documents (the "AI Documents"), arguing that (1) Heppner had inputted into Claude, among other things,

information that Heppner had learned from counsel; (2) Heppner had created the AI Documents for the purpose of speaking with counsel to obtain legal advice; and (3) Heppner had subsequently shared the contents of the AI Documents with counsel. See Gov't Mot. at 3-4, 11; ECF Nos. 23-2, 23-4, 23-5. Heppner's counsel conceded, however, that counsel "did not direct [Heppner] to run Claude searches." ECF No. 23-5. Pursuant to a "Privilege Protocol Stipulation," the Government and Heppner's counsel agreed that the Government would segregate the AI Documents and not inspect them pending the resolution of Heppner's claims of privilege, and Heppner's counsel listed the AI Documents in Heppner's privilege log. See Gov't Mot. at 3-4 & n.1; ECF Nos. 23-1, 23-2.

On February 6, 2026, the Government moved, in writing, for a ruling that the AI Documents are protected by neither the attorney-client privilege nor the work product doctrine. Gov't Mot. The Court heard oral argument on the Government's motion at the pretrial conference held on February 10, 2026, and, as noted, orally granted the motion.

## II. Attorney-Client Privilege

It is well established that the attorney-client privilege attaches to, and protects from disclosure, "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d

Cir. 2011).[2] Courts construe the attorney-client privilege narrowly because it operates as an exception to the rule that "all relevant proof is essential" for a complete record and for "confidence in the fair administration of justice." In re Six Grand Jury Witnesses, 979 F.2d 939, 943 (2d Cir. 1992). See also, e.g., Calvin Klein Trademark Tr. v. Wachner, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).

Applying these principles here, the AI Documents lack at least two, if not all three, elements of the attorney-client privilege. First, the AI Documents are not communications between Heppner and his counsel. Heppner does not, and indeed could not, maintain that Claude is an attorney. "In the absence of an attorney-client relationship, the discussion of legal issues between two non-attorneys is not protected by attorney-client privilege." E.g., In re OpenAI, Inc., Copyright Infringement Litig., 802 F. Supp. 3d 688, 699 (S.D.N.Y. 2025). Because Claude is not an attorney, see ECF No. 23-6, that alone disposes of Heppner's claim of privilege.

The Court is aware that some commentators have argued that whether Claude is an attorney is irrelevant because a user's AI inputs, rather than being communications, are more akin to the use of other Internet-based software, such as cloud-based word processing applications. But the use of such applications is not intrinsically privileged in any case, and the argument that Claude is like any other form of software

[2] Except where otherwise indicated, all quotations in this Memorandum omit citations, quotation marks, footnotes, brackets, ellipses, and other alterations in source material.

only cuts against the invocation of privilege because all "[r]ecognized privileges" require, among other things, "a trusting human relationship," such as, in the attorney-client context, a relationship "with a licensed professional who owes fiduciary duties and is subject to discipline." See Ira P. Robbins, Against an AI Privilege, JOLT Dig., Harvard L. Sch. (Nov. 7, 2025), https://jolt.law.harvard.edu/digest/against-an-ai-privilege. No such relationship exists, or could exist, between an AI user and a platform such as Claude.

Second, the communications memorialized in the AI Documents were not confidential. This is not merely because Heppner communicated with a third-party AI platform but also because the written privacy policy to which users of Claude consent provides that Anthropic collects data on both users' "inputs" and Claude's "outputs," that it uses such data to "train" Claude, and that Anthropic reserves the right to disclose such data to a host of "third parties," including "governmental regulatory authorities." See Anthropic, Privacy Policy (as of February 19, 2025), https://www.anthropic.com/legal/archive/ a2eecf43-807a-4a53-89dd-04c44c351138. The policy clearly puts Claude's users on notice that Anthropic, even in the absence of a subpoena compelling it to do so, may "disclose personal data to third parties in connection with claims, disputes[,] or litigation." Id. More generally, as another court in this District recently observed, AI users do not have substantial privacy interests in their "conversations with [another publicly accessible AI platform] which users voluntarily disclosed" to the platform and which the platform "retains in the normal course

of its business." *In re OpenAI, Inc., Copyright Infringement Litig.*, No. 25 MD 3143, ECF No. 1021 at 3 (Jan. 5, 2026). For these reasons, Heppner could have had no "reasonable expectation of confidentiality in his communications" with Claude. *See Mejia*, 655 F.3d at 132-34. And the AI Documents are not like confidential notes that a client prepares with the intent of sharing them with an attorney because Heppner first shared the equivalent of his notes with a third-party, Claude. *Cf. United States v. DeFonte*, 441 F.3d 92, 95-96 (2d Cir. 2006) (per curiam).

*Third*, Heppner did not communicate with Claude for the purpose of obtaining legal advice. This issue perhaps presents a closer call because Heppner's counsel asserts that Heppner communicated with Claude for the "express purpose of talking to counsel." ECF No. 23-5. But, as Heppner's counsel also conceded, Heppner did not do so at the suggestion or direction of counsel. *See id.* (noting that counsel "did not direct [Heppner] to run Claude searches"). Had counsel directed Heppner to use Claude, Claude might arguably be said to have functioned in a manner akin to a highly trained professional who may act as a lawyer's agent within the protection of the attorney-client privilege. *Cf. United States v. Adlman*, 68 F.3d 1495, 1498-99 (2d Cir. 1995) (citing *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961)). But because Heppner communicated with Claude of his own volition, what matters for the attorney-client privilege is whether Heppner intended to obtain legal advice *from Claude*, not whether he later shared Claude's outputs with counsel. And Claude disclaims providing legal

advice. Indeed, when the Government asked Claude whether it could give legal advice, it responded that "I'm not a lawyer and can't provide formal legal advice or recommendations" and went on to recommend that a user "should consult with a qualified attorney who can properly assess your specific circumstances." ECF No. 23-6 at 1-2.

Thus, the communications between Heppner and Claude were not privileged at the time they took place.[3] Moreover, even assuming that Heppner intended to share these communications with his counsel and eventually did so, it is black-letter law that non-privileged communications are not somehow alchemically changed into privileged ones upon being shared with counsel. Thus, because the AI Documents "would not be privileged if they remained in [Heppner's] hands," they did not "acquire protection merely because they were transferred" to counsel. See Gould, Inc. v. Mitsui Min. & Smelting Co., Ltd., 825 F.2d 676, 679-80 (2d Cir. 1987).

## III. Work Product Doctrine

Related to but distinct from the attorney-client privilege, the work product doctrine, "[a]t its core[,] . . . shelters the mental processes of the attorney, providing a privileged area within which

---

[3] At oral argument, Heppner's counsel suggested in passing that the AI Documents may be privileged because they "incorporated information that we had conveyed to Mr. Heppner over the course of our representation." Tr. at 3. But even if certain information that Heppner input into Claude was privileged, he waived the privilege by sharing that information with Claude and Anthropic, just as if he had shared it with any other third party. Further, in light of Anthropic's privacy policy discussed above, Heppner had no reasonable expectation that the inputs would not be shared with other third parties.

he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975). The doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." In re Grand Jury Subpoenas Dated March 19, 2002, and August 2, 2002, 318 F.3d 379, 383 (2d Cir. 2003). As with the attorney-client privilege, the work product doctrine is not "lightly created nor expansively construed," id. (quoting United States v. Nixon, 418 U.S. 683, 710 (1974)), and the Second Circuit has repeatedly held that the doctrine's purpose "is not generally promoted by shielding from discovery materials in an attorney's possession that were prepared neither by the attorney nor his agents," id. (citing Matter of Grand Jury Subpoenas Dated Oct. 22, 1991, and Nov. 1, 1991, 959 F.2d 1158 (2d Cir. 1992)). The doctrine's availability in reference to materials in the possession of a client "depends upon the existence of a real, rather than speculative, concern that the thought processes of [the client's] counsel in relation to pending or anticipated litigation would be exposed." Matter of Grand Jury Subpoenas, 959 F.2d at 1167 (quoting Gould, 825 F.2d at 680).

The AI Documents do not merit protection under the work product doctrine because, even assuming, arguendo, that they were prepared "in anticipation of litigation," In re Grand Jury Subpoenas, 318 F.3d at 383, they were nevertheless not "prepared by or at the behest of counsel," id., nor did they reflect defense counsel's strategy, see Matter of Grand Jury Subpoenas, 959 F.2d at 1167. As to the former, Heppner's counsel confirmed that the AI Documents "were prepared by

the defendant on his own volition." Tr. at 5. That means that Heppner was not acting as his counsel's agent when he communicated with Claude. As to the latter, counsel conceded that while the AI Documents did "affect" counsel's strategy going forward, they did not "reflect" counsel's strategy at the time that Heppner created them. See id.

At oral argument, Heppner resisted these conclusions by relying on two authorities. The first, Federal Rule of Criminal Procedure 16(b)(2)(A), is inapplicable on its face. That rule provides that, where the Government provides a defendant with pretrial discovery and the defendant thereby becomes obligated to satisfy the Government's pretrial discovery requests, the defendant's obligation does not extend to "discovery or inspection of reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense." Id. Here, however, the AI Documents were seized from Heppner, at the time of his arrest, pursuant to a search warrant the validity of which Heppner's counsel does not challenge. See Gov't Mot. at 3. The Government did not request them, and Heppner did not produce them, in pretrial discovery.

Heppner's second authority is Shih v. Petal Card, Inc., 565 F. Supp. 3d 557 (S.D.N.Y. 2021). In that case, a Magistrate Judge in this District authorized the plaintiff to withhold certain communications that she had with an individual who was then her lawyer, and later became her husband, that the plaintiff prepared in anticipation of litigation or for trial. The court held that the work product doctrine protected such communications, "regardless of whether [the

lawyer/husband] was acting as her counsel at the time, and without showing that another attorney 'directed the work.'" Id. at 574.

Shih, of course, is not binding on this Court, and this Court respectfully disagrees with its holding. As relevant here, the court in Shih principally concluded that the work product doctrine is not limited to materials prepared by or at the direction of an attorney. Id. But that conclusion undermines the policy animating the work product doctrine, which, as one of the cases cited in Shih explains, is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation.'" Parneros v. Barnes & Noble, Inc., 332 F.R.D. 482, 492 (S.D.N.Y. 2019) (quoting United States v. Adlman, 134 F.3d 1194, 1996 (2d Cir. 1998) (quoting, in turn, Hickman v. Taylor, 329 U.S. 495, 510-11 (1947))); see Shih, 565 F. Supp. 3d at 574 (citing Parneros). While it is true that the work product doctrine may apply to materials generated by non-lawyers, the Second Circuit has repeatedly stressed that the purpose of the doctrine is to protect lawyers' mental processes. See, e.g., In re Grand Jury Subpoenas, 318 F.3d at 383-85 (extensively describing doctrine's rationale and applying it to material "prepared by or for counsel"); Adlman, 134 F.3d at 1197 (similar); Adlman, 68 F.3d at 1500-02 (similar); Matter of Grand Jury Subpoenas, 959 F.2d at 1166 (doctrine "generally does not shield from discovery documents that were not prepared by the attorneys themselves, or their agents"); see also Bice v. Robb, 511 F. App'x 108, 110 (2d Cir. 2013) (summary

order) (declining to extend protection to documents "not the work product of an individual acting as [plaintiffs'] attorney").

Here, there is no dispute that Heppner acted on his own when he created the AI Documents. See ECF No. 23-5 (noting that defense counsel "did not direct [Heppner] to run Claude searches"); Tr. at 5 (confirming same). Because the AI Documents were not prepared at the behest of counsel and did not disclose counsel's strategy, they do not merit protection as work product.

## IV. Conclusion

Generative artificial intelligence presents a new frontier in the ongoing dialogue between technology and the law. Time will tell whether, as in the case of other technological advances, generative artificial intelligence will fulfill its promise to revolutionize the way we process information. But AI's novelty does not mean that its use is not subject to longstanding legal principles, such as those governing the attorney-client privilege and the work product doctrine. Because Heppner's use of Claude fails to satisfy either of these rules, the AI Documents do not merit the protections Heppner has claimed.

New York, NY
February 17, 2026

JED S. RAKOFF, U.S.D.J.